1  BRIAN L. DAVIDOFF (SBN 102654)
   BDavidoff@GreenbergGlusker.com
2  C. JOHN M. MELISSINOS (SBN 149224)
   JMelissinos@GreenbergGlusker.com
3  COURTNEY E. POZMANTIER (SBN 242103)
   CPozmantier@GreenbergGlusker.com
4  GREENBERG GLUSKER FIELDS CLAMAN
   & MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
6  Telephone:  310.553.3610
   Fax:  310.553.0687
7
   Proposed General Bankruptcy Attorneys for
8  Debtor and Debtor in Possession

9

                  UNITED STATES BANKRUPTCY COURT
10
                  CENTRAL DISTRICT OF CALIFORNIA
11
                       LOS ANGELES DIVISION
12

13

14  In re:                              Case No. 2:13-bk-13775-NB

15  RHYTHM AND HUES, INC.,              Chapter 11

16        Debtor and Debtor in Possession.   **DEBTOR'S MOTION FOR ORDERS:
                                        (1) APPROVING SALE OF DEBTOR'S
17                                      ASSETS UNDER ASSET PURCHASE
                                        AGREEMENT FREE AND CLEAR OF
18                                      LIENS, CLAIMS AND INTERESTS,
                                        (2) APPROVING ASSUMPTION AND
19                                      ASSIGNMENT OF UNEXPIRED LEASES
                                        AND EXECUTORY CONTRACTS,
20                                      (3) APPROVING CERTAIN BID AND
                                        AUCTION PROCEDURES, INCLUDING A
21                                      BREAK-UP FEE, (4) SETTING DATE AND
                                        TIME FOR HEARING ON PROPOSED
22                                      SALE, AND (5) APPROVING FORM AND
                                        NOTICE OF AUCTION AND SALE
23                                      HEARING; DECLARATIONS OF JOHN
                                        PATRICK HUGHES AND PETER S.
24                                      FISHMAN IN SUPPORT THEREOF**

                                        [Order Shortening Time Requested]
25
                                        Date:   TBD
26                                      Time:   TBD
                                        Place:  Courtroom 1545
27                                              255 E. Temple Street
                                                Los Angeles, CA 90012
28

74262-00017/1906426.7

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, OTHER PARTIES-IN-INTEREST HEREIN AND THEIR RESPECTIVE COUNSEL:**

Rhythm And Hues, Inc., debtor and debtor and possession (the "Debtor" or the "Company"), hereby moves this Court for the entry of orders pursuant to, *inter alia*, sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

1.   setting a hearing on shortened time on March 8, 2013, or as soon thereafter or as soon thereafter as the Court's calendar may permit, (the "Bid Procedures Hearing"), to consider the relief requested in the following paragraphs 2 through 6;

2.   approving the procedures, dates and deadlines set forth in Exhibit 1 hereto (collectively, the "Bid Procedures")[1], including those relating to:

a.   the submission and consideration of bids in respect of the proposed sale,

b.   the conduct of an auction (the "Auction") by the Debtor on March 18, 2013 or such other date that the Court may direct,

c.   the provision of notice to potential bidders, counterparties to executory contracts and unexpired leases that may be assumed and assigned, and other parties in interest; and

d.   the proposed sale of substantially all of the assets of the Debtor free and clear of liens, claims and interests to the party that submits the prevailing bid for the Debtor's assets (the "Buyer");

/ / /

/ / /

---

[1] As noted later in this Motion, all of the Bid Procedures set forth herein may be subject to change as required by a Stalking Horse Bidder, and as approved by the Court.

1    3.    approving the form and manner of notice of the proposed sale of assets, the

2    hearing thereon, the Bid Procedures, and related matters, substantially in the form attached

3    hereto as Exhibit 2 (the "Sale and Procedures Notice");

4    4.    approving the form and manner of notice regarding the executory contracts

5    and unexpired leases that may be assumed and assigned to the Buyer and the procedure

6    for determining the cure amounts, if any, associated with these agreements (the "Cure

7    Amount"), substantially in the form attached hereto as Exhibit 3 (the "Contract Notice");

8    5.    (i) approving the assumption and assignment of executory contracts and

9    unexpired leases of the Debtor pursuant to the APA, (ii) determining that there are no

10   defaults under such contracts and leases other than the payment of certain cure costs, if

11   any, proposed by the Debtor, (iii) determining, at the Sale Hearing, that the Buyer  has

12   provided adequate assurance of future performance; and (iv) waiving, to the extent

13   applicable, the requirements of Bankruptcy Rule 6006(f)(6);

14   6.    authorizing a break-up fee in favor of the Stalking Horse Bidder, if any,

15   equal to 1.5% of the total consideration offered by the Stalking Horse Bidder, capped at

16   $150,000 (the "Break-Up Fee");

17   7.    setting (i) the hearing to approve the sale of the Debtor's assets (the "Sale

18   Hearing") on March 19, 2013, or as soon thereafter as the Court's calendar may permit,

19   (ii) the deadline to file and serve any objection to such relief, and (iii) the deadline to file

20   and serve any reply in support of such relief;

21   8.    approving the form of asset purchase agreement (the "APA") attached

22   hereto as Exhibit 4,[2] and all of the transactions contemplated thereby;

23   9.    finding that the Buyer is a good faith purchaser entitled to the protections

24   of Bankruptcy Code section 363(m); and

25

26

---

[2]   With the exception of the schedule of definitions, the APA attached as Exhibit 4 does not include the schedules
to that document, which schedules contain confidential and proprietary information.  Subject and pursuant to the
Bid Procedures, the Debtor will make these schedules available to a qualified potential bidder that executes a
confidentiality agreement in accordance with the Bid Procedures.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1       10. providing that all of the foregoing relief shall be effective immediately

2    upon entry of the applicable order granting such relief, and that any stay of such order

3    under Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not be applicable.

4       This motion (the "Motion") is supported by these moving papers, the annexed legal

5    memorandum (the "Legal Memorandum"), the annexed declarations of John Patrick Hughes and

6    Peter S. Fishman (the "Hughes Declaration" and the "Fishman Declaration," respectively),  the

7    *Declaration of John Patrick Hughes in Support of First Day Motions* [Docket No. 9] (the

8    "Hughes First Day Declaration"), *Declaration of John F. Hedge in Support of First Day Motions*

9    [Docket No. 8] (the "Hedge First Day Declaration"), any oral or documentary evidence presented

10   at or prior to the hearings on this Motion, and the arguments and representations of counsel made

11   at the hearings on this Motion.

12      Concurrently herewith, the Debtor has filed its motion pursuant to Local Rule 9075-1 (the

13   "OST Motion"), requesting an order shortening time and requesting an initial hearing on this

14   Motion on March 8, 2013, or as soon thereafter as the matter may be heard.

15      **WHEREFORE,** based on all of the foregoing, the Debtor respectfully requests that this

16   Court grant the relief requested herein and such other relief as the Court deems necessary and

17   appropriate.

18

19   DATED: March 2, 2013      GREENBERG GLUSKER FIELDS CLAMAN
                & MACHTINGER LLP

20

21              By: */s/ Courtney E. Pozmantier*
            BRIAN L. DAVIDOFF

22               C. JOHN M. MELISSINOS
            COURTNEY E. POZMANTIER

23               Proposed General Bankruptcy Attorneys for
            Debtor and Debtor in Possession

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# TABLE OF CONTENTS

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**Page**

I. STATUS OF THE CASE AND JURISDICTION ................................................................. 1

II. FACTUAL BACKGROUND ............................................................................................. 1

   A. Background on the Debtor and its Operations ...................................................... 1

   B. Events Leading to the Filing of this Case ............................................................ 3

   C. The Need for and Expedited Sale of the Debtor's Assets ..................................... 5

   D. The Sale Process and the Proposed Sale .............................................................. 7

   E. The Assets Subject to Sale and Purchase Price.................................................... 8

   F. The Bid Procedures ............................................................................................. 9

   G. Contracts and Leases ........................................................................................ 16

   H. The Break-Up Fee ............................................................................................. 18

   I. Lienholders ....................................................................................................... 19

   J. Proposed Sale Hearing and Related Deadlines ................................................... 19

   K. Notice ............................................................................................................... 20

      1. Service of the Motion....................................................................... 20

      2. Service of the Sale and Procedures Notice ........................................ 20

      3. Service of the Contract Notice and Other Pleadings........................... 21

III. LEGAL ARGUMENT .................................................................................................. 21

   A. The Bid Procedures Should Be Approved .......................................................... 21

   B. The Proposed Form and Manner of Notice of the Proposed Sale and the Bid Procedures Is Reasonable and Appropriate................................................... 22

   C. The Proposed Sale of Assets Should Be Approved as a Sound Exercise of the Debtor's Business Judgment ....................................................................... 23

   D. Assumption and Assignment of the Contracts and Leases Is Appropriate .......... 25

      1. The Business Judgment Test is Satisfied ........................................... 26

      2. Parties will be Provided With Adequate Assurance of Future Performance .................................................................................... 27

   E. Assumption and Assignment of More Than 100 Contracts and Leases Pursuant to the Motion Is Appropriate, As Is Notice Thereof Pursuant to the Contract Notice ........................................................................................... 28

   F. The Break-Up Fee Should be Approved.............................................................. 29

   G. The Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to Section 363(f) Is Permitted Under the Circumstances ............................................................................................. 31

   H. The Court Should Find the Sale Is in Good Faith ............................................... 32

   I. The Court Should Waive the Stay Under Bankruptcy Rules 6004(h) and 6006(d) ............................................................................................................. 33

IV. CONCLUSION ............................................................................................................ 34

# TABLE OF AUTHORITIES

**Page**

CASES

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),*
    181 F.3d 527 (3d Cir. 1999)............................................................................................ 22

*Ewell v. Diebert (In re Ewell),*
    958 F.2d 276 (9th Cir. 1992)......................................................................................... 32

*Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.),*
    346 F.3d 31 (2d Cir. 2003)............................................................................................ 30

*Group of Institutional Investors v. Chicago, Milwaukee St. Paul & Pac. R.R. Co.,*
    318 U.S. 523 (1943)....................................................................................................... 26

*Hoese Corp. v. Vetter Corp. (In re Vetter Corp.),*
    724 F.2d 52 (7th Cir. 1983)........................................................................................... 33

*In re 995 Fifth Ave. Assocs., L.P.,*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989)............................................................................. 30

*In re Abbotts Dairies, Inc.,*
    788 F.2d 143 (3d Cir. 1986).......................................................................................... 32

*In re Advanced Materials, Inc., et al.,*
    Case No. 09-16548 (TA) (Bankr. C.D. Cal. July 2, 2009)........................................... 22

*In re Airlift Int'l, Inc.,*
    18 B.R. 787 (Bankr. S.D. Fla. 1982)............................................................................ 24

*In re Care Level Mgmt. Group, LLC, et al.,*
    Case No. 08-12913 (MT) (Bankr. C.D. Cal. May 7, 2008) .......................................... 22

*In re Channel One Commc'ns, Inc.,*
    117 B.R. 493 (Bankr. E.D. Mo. 1990).......................................................................... 32

*In re Chi-Feng Huang,*
    23 B.R. 798 (B.A.P. 9th Cir. 1982)............................................................................... 26

*In re Continental Air Lines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986)....................................................................................... 23

*In re Edwards,*
    962 F.2d 641 (7th Cir. 1992)......................................................................................... 33

*In re Ernst Home Ctr.,*
    209 B.R. 974 (Bankr. W.D. Wash. 1997) .................................................................... 23

*In re Fed. Mogul Global, Inc.,*
    293 B.R. 124 (D. Del. 2003) ......................................................................................... 21

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

# TABLE OF AUTHORITIES

2

Page

3    *In re Fleetwood Enters., Inc., et al.*,
        Case No. 09-14254 (MJ) (Bankr. C.D. Cal. March 10, 2009) ................................. 22

4

5    *In re Global Home Prods., LLC*.,
        Case No. 06-10340 (KG) (Bankr. D. Del. April 10, 2006) ..................................... 22

6    *In re Highway Equip. Co.*,
        61 B.R. 58 (Bankr. S.D. Ohio 1986) ..................................................................... 24

7

8    *In re Hupp Indus., Inc*.,
        140 B.R. 191 (Bankr. N.D. Ohio 1992) ................................................................ 30

9    *In re Integrated Res., Inc*.,
        147 B.R. 650 (S.D.N.Y. 1992) ............................................................................. 29

10

11    *In re Ionosphere Clubs, Inc.*,
        100 B.R. 670 (Bankr. S.D.N.Y. 1989) ................................................................. 24

12    *In re Kellstrom Indus., Inc.*,
        282 B.R. 787 (Bankr. D. Del. 2002) ..................................................................... 31

13

14    *In re Linens Holding Co*.,
        Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) ...................................... 22

15    *In re Lionel Corp.*,
        722 F.2d 1063 (2d Cir. 1983) .............................................................................. 23

16

17    *In re Med. Software Solutions*,
        286 B.R. 431 (Bankr. D. Utah 2002) ................................................................... 24

18    *In re Nortel Networks, Inc.*,
        2011 Bankr. LEXIS 1745 (Bankr. D. Del. May 2, 2011) ................................. 28, 29

19

20    *In re Old Carco LLC*,
        406 B.R. 180 (Bankr. S.D.N.Y. 2009) ................................................................. 28

21    *In re Pomona Valley Med. Group, Inc.*,
        476 F.3d 665 (9th Cir. 2007) ........................................................................ 23, 26

22

23    *In re PPK Enters., Inc.*,
        235 B.R. 597 (Bankr. E.D. Tex. 1999) ................................................................. 27

24    *In re S.N.A. Nut Co.*,
        186 B.R. 98 (Bankr. N.D. Ill. 1995) ..................................................................... 24

25

26    *In re Station Casinos, Inc., et al*.,
        Case No. 09-52477 (GWZ) (Bankr. D. Nev. June 4, 2010) ................................... 22

27    *In re Tech Hifi, Inc.*,
        49 B.R. 876 (Bankr. D. Mass 1985) ..................................................................... 27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# TABLE OF AUTHORITIES

Page

*In re THW Enters., Inc.*,
   89 B.R. 351 (Bankr. S.D.N.Y. 1988) ................................................................................ 27

*In re VI Acquisition Corp.*,
   Case No. 08-10623 (KG) (Bankr. D. Del. Apr. 3, 2008) .................................................. 22

*In re Worcester*,
   811 F.2d 1224 (9th Cir. 1987) .......................................................................................... 28

*Lewis v. Anderson*,
   615 F.2d 778 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980) .................................... 24

*Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*,
   325 B.R. 282 (B.A.P. 9th Cir. 2005) ................................................................................. 21

*Stephens Indus., Inc. v. McClung*,
   789 F.2d 386 (6th Cir. 1986) ............................................................................................ 23

*Toibb v. Radloff*,
   501 U.S. 157 (1991) .......................................................................................................... 22

*Walter v. Sunwest Bank (In re Walter)*,
   83 B.R. 14 (B.A.P. 9th Cir. 1987) ..................................................................................... 23

**STATUTES**

11 U.S.C. § 105 ...................................................................................................................... 1

11 U.S.C. § 363 ........................................................................................................... 1, 32, 33

11 U.S.C. § 363(b)(1) ................................................................................................. 21, 23, 32

11 U.S.C. § 363(m) ......................................................................................................... 32, 33

11 U.S.C. § 365 ................................................................................................................ 1, 26

11 U.S.C. § 365(a) ................................................................................................................ 25

11 U.S.C. § 365(b)(1) ........................................................................................................... 25

11 U.S.C. § 365(b)(1)(C) ...................................................................................................... 17

11 U.S.C. § 365(f) ......................................................................................... 16, 26, 31, 32, 33

11 U.S.C. § 365(f)(1) ............................................................................................................ 26

11 U.S.C. § 365(f)(2) .................................................................................................. 27, 28, 31

11 U.S.C. § 1107(a) ................................................................................................................ 1

11 U.S.C. § 1108 .................................................................................................................... 1

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 157 ................................................................................................ 1

28 U.S.C. § 157(b)(2) ....................................................................................... 1

28 U.S.C. § 1334 .............................................................................................. 1

28 U.S.C. § 1408 .............................................................................................. 1

28 U.S.C. § 1409 .............................................................................................. 1

**REGULATIONS AND RULES**

Fed. R. Bankr. P. 6004 ............................................................................... 1, 22

Fed. R. Bankr. P. 6004(a) ............................................................................... 22

Fed. R. Bankr. P. 6004(h) ............................................................................... 33

Fed. R. Bankr. P. 6006 ..................................................................................... 1

Fed. R. Bankr. P. 6006(d) ............................................................................... 33

Fed. R. Bankr. P. 6006(f) ........................................................................... 28, 29

Fed. R. Bankr. P. 6006(f)(6) ........................................................................... 28

Fed. R. Bankr. P. 2002 ............................................................................... 1, 22

Fed. R. Bankr. P. 2002(a)(2) ........................................................................... 22

Local Bankruptcy Rule 2002(b) ...................................................................... 20

Fed. R. Bankr. P. 2002(c)(1) ........................................................................... 22

Fed. R. Bankr. P. 2002(j) ................................................................................ 20

Local Bankruptcy Rule 6004-1 ....................................................................... 22

Local Bankruptcy Rule 6004-1(f) ................................................................... 20

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.    STATUS OF THE CASE AND JURISDICTION

The Debtor commenced this case by filing a voluntary petition for relief under title 11 of the Bankruptcy Code.  The Debtor is in possession of its property and is operating and managing its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request for a trustee or examiner has been made.  An Official Committee of Unsecured Creditors (the "Committee") was appointed on February 28, 2013.

The Court has jurisdiction over this case, the Debtor's estate and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## II.    FACTUAL BACKGROUND

### A.    Background on the Debtor and its Operations.

The detailed factual background relating to the Debtor and the commencement of this case is set forth in the Hughes First Day Declaration and the Hedge First Day Declaration.

The Debtor is one of the world's leading producers of visual effects ("VFX") and computer-generated ("CG") animation for the entertainment industry.  As the largest VFX and CG animation studio in Los Angeles (and among the top eight globally), the Company has contributed to more than 150 feature films and has received numerous industry awards and accolades for its work, including Academy Awards (Best Visual Effects) for *Babe*, *The Golden Compass,* and *Life of Pi*, an Academy Award nomination for *The Chronicles of Narnia*, and Technical Achievement Academy Awards in 1994, 1998, 2008 and 2010.

The Company maintains long-standing relationships with all of the major Hollywood studios and provides these studios with a highly resourceful and creative production team,

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion or the APA, as applicable.

1  offering a wide range of VFX and CG animation services.  In addition to films, the Company is

2  also one of the leaders in the production of commercial advertising, cinematic game design and

3  special venue and theme park films.  It has created filmed attractions for several of Disney's and

4  Universal's theme parks around the world, as well as filmed attractions installed in Las Vegas.

5        The Debtor is headquartered in El Segundo, California, where its 135,000 square foot

6  facility is located.  Until shortly before the commencement of this case, the Company employed

7  more than 700 permanent and temporary employees at the El Segundo facility.  Currently, the

8  Debtor employs approximately 450 employees.  The Debtor expects to reject the lease of its El

9  Segundo headquarters in connection with the sale of its assets, or shortly thereafter.

10        In addition to the California location, the Company and its affiliates and subsidiaries have

11  six world-wide locations: two facilities in India – one each in Mumbai and Hyderabad – a facility

12  in Kuala Lumpur, Malaysia, which it uses on a contract basis, a wholly-owned subsidiary with a

13  facility in Vancouver, Canada, and its latest facility which was opened last year in Kaohsiung,

14  Taiwan.  All of these international facilities are integrated into the Company's worldwide

15  production pipeline and allow for consistent standards of quality and training and cross-border

16  collaboration for all post-production projects.  The India, Canada and Taiwan facilities are all

17  owned by separate foreign entities, each of which is in turn 100% owned and controlled by the

18  Company.  The Malaysia entity is owned by a sister company, not directly owned by the

19  Company, but instead by the same shareholders which own the equity of the Company.

20        The Debtor is frequently sought after to support the development of many of

21  Hollywood's highest profile feature films.  The Debtor's three largest customers, Warner

22  Brothers ("WB"), 20th Century Fox ("Fox"), and Universal Studios ("Universal"), represent

23  approximately 97% of the Company's gross revenues over the past three years.  The Debtor is

24  one of the top two providers of VFX services for Fox and Universal, and it was a preferred

25  provider of VFX services for WB.  In addition, the Company has begun cultivating relationships

26  with "mini major" studios like Legendary and Summit Entertainment ("Summit").

27        The Company has historically been active in the early stages of feature film production,

28  both in the planning and choreographing phases as well as, more recently, through co-investing

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    and co-producing blockbuster hits such as Yogi Bear 3D and Hop.

2    The Company is also engaged in the production of commercial advertising and cinematics

3    for game design and special venue and theme park films.  The Company is currently in advanced

4    discussions to create several theme park attractions for a theme park in China.  Other types of

5    business opportunities for the Company include cloud computing.  In 2011, the Company entered

6    into a collaborative venture with Taiwan-based Chunghwa Telecom. The collaboration is named

7    CAVE, which stands for Cloud Animation and Visual Effects.  CAVE is a commercial venture to

8    provide computer intensive industries with cost effective solutions for processor time and disk

9    storage.  The product of this effort will both lower the cost of technology and provide an

10   additional revenue stream to the Company.

11   Finally, the nature of the Company's work requires the Company to constantly pioneer

12   new technologies, and to push existing technologies to their limits, so as to continue eliciting the

13   "wow" response from both movie-goers and industry insiders.  In support of this goal, the

14   Company has developed its own proprietary animation, lighting, simulation, rendering and

15   compositing software.

16   **B.**        **Events Leading to the Filing of this Case.**

17   The Company's ability to maintain profitability is directly related to its gross revenues.

18   The gross revenues for 2009 to 2011 were $108.9 million, $86.7 million and $121.4 million,

19   respectively.  Revenue in 2012 was only $95.0 million, leading to the net loss of approximately

20   $22.5 million.

21   The Company's revenue, in turn, is highly correlated to feature production and release

22   schedules of the major Hollywood studios.  As such, revenue generation can be, at times, difficult

23   to project.  Also, with a high level of fixed overhead, significant fluctuations in feature film

24   production at Hollywood studios have a direct impact on the Company's profitability.  The

25   decline in revenue in 2012 was partly due to a decrease in feature film work, driven

26   predominately by a slight decrease in film production at Fox and Universal (historically two of

27   the Company's largest customers).

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    In an effort to strengthen the Company's financial position, the Debtor hired Focal Point

2    Partners ("Focal Point") in June 2012 to explore strategic options for the Company, including a

3    sale of some or all of its assets.    Focal Point was also tasked with trying to find additional capital

4    to sustain the Company's operations during an anticipated period when it was felt current jobs

5    would be unable to carry the costs of doing so.  Focal Point established an electronic "data room"

6    and took other steps typical in the marketing of middle-market companies such as the Debtor,

7    including the preparation of a "pitch book" touting the Company which was distributed to

8    potential buyers.

9    Focal Point solicited over 100 potential strategic and financial buyers for the

10    Company.  Approximately 12 entities submitted expressions of interest in the Debtor, and

11    performed varying levels of due diligence regarding a transaction with the Debtor. One entity

12    submitted a confidential offer for the purchase of the Debtor's assets, but the total consideration

13    offered was ultimately too low to allow the Debtor to proceed with the transaction.

14    In October 2012 the Company retained The Hina Group, a Chinese investment bank, to

15    supplement Focal Point's efforts in Asia.  Ultimately, there were no viable opportunities

16    identified through this process.

17    Shortly before the Petition Date, an entity agreed to purchase the stock of the Debtor for a

18    nominal amount, assume the DIP Loan (as defined below), and pledged to invest $30 million in

19    the Company.   This entity was unable to close the transaction, which left the Company in a dire

20    situation.

21    Specifically, the Company was not in a position to complete its current projects for WB,

22    Universal, Fox and Legendary at bid amounts of these projects, and therefore needed additional

23    funding to pay the costs (mostly labor) for the projects to be completed, or it would default under

24    its agreements with these entities.  Moreover, because of what the Debtor believes to be

25    temporary softness in the market for VFX work, the Company does not have enough new work to

26    allow it to absorb the overages needed to pay for completion of these existing contracts.

27    The Debtor's management and advisors worked with Legendary, WB, Universal and Fox

28    in an attempt to restructure the agreements with Legendary, WB, Universal and Fox or to provide

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  a method by which sufficient funds can be injected into the Debtor so that it can finish the

2  projects and maintain its operations until it can attract additional projects.  The result of these

3  discussions is the DIP Loan being provided to the Company by Universal and Fox, jointly, and

4  the Change Order with Legendary (discussed below).

5      Based on the foregoing, the Debtor concluded that the best course of action would be to

6  file chapter 11 to secure the DIP Loan and further stabilize the Debtor's operations pending a sale

7  of the Debtor's assets in chapter 11 or implementation of another restructuring solution.

8      **C.**    **The Need for and Expedited Sale of the Debtor's Assets.**

9      The DIP Loan provided by Universal and Fox principally funds the work the Debtor is

10  performing for them, and certain expenses associated with the Debtor's chapter 11 case.  The

11  funding under the DIP Loan is not enough to sustain the Debtor's operations in the long-term or

12  allow the Debtor to perform under its contracts with other studios and production ventures.

13      To that end, the Debtor recently reached an agreement with Legendary, which was

14  approved by the Court on February 20, 2013, under which Legendary will pay approximately

15  $4,961,751 to the Debtor to finish its work on the film the *Seventh Son*.   Legendary is not

16  participating in the DIP Loan and will make payments to the Company pursuant to a court order

17  (the "Change Order").   The Debtor's entry into the Change Order was very beneficial, as it

18  allows for the payment of wages owing to employees related to the Legendary project, and will

19  provide needed post-petition work for the Debtor.   Assuming all of the amounts due under the

20  Change Order are paid, the DIP Loan funding will be reduced by up to $1.1 million – the

21  approximate amount of the overhead reduction that the Debtor will realize from the payments

22  under the Change Order – with such adjustments made on a bi-weekly basis.

23      Thus, while the Company has been able to negotiate funding to complete its existing

24  projects with Universal, Fox and Legendary, any delay in delivery of the Debtor's work on these

25  projects, or increase in the cost of the Debtor's overhead, will upset the delicate financial balance

26  the Debtor has achieved.   Unfortunately, delays in delivery and fluctuations in overhead are a

27  natural part of the Debtor's business due to the highly technical nature of the Debtor's work and

28  uncertainties inherent in the creative process.  The approved budget under the DIP Loan (the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  "Approved DIP Budget") contemplates funding for operations which allow the Company to

2  complete its existing projects for Universal and Fox.  *See* Docket No. 7, Exhibit A.  However, as

3  this work is finished, the staffing levels required by the Company are projected to decrease

4  significantly commencing in mid-March.  *See id.*  At that time, the Debtor will face the prospect

5  of further reducing its workforce as it begins to exhaust its funding under the Approved DIP

6  Budget.  *See id*.  Therefore, to preserve the viability of the Debtor's current operations, any sale

7  must occur by mid-March.

8        The Company must also preserve its international operations.  Since opening its

9  Vancouver office in September of 2011, it has now become widely known that the Company has

10  a facility in a government-subsidized location, and Company has been included in considerably

11  more requests for bids as a result.  Furthermore, because the Company's Asian facilities are very

12  efficient economically due to lower labor costs, the Company will be able to further lower costs

13  and increase its profits as it increases the amount of the work it does in Asia.  The Company's

14  viability in the international market is crucial to the going concern value of Company.

15        Given the Debtor's liquidity constraints and lack of long-term financing, the Debtor and

16  its advisors have determined that a sale of the Debtor's assets is the only way for the Company to

17  successfully reorganize.  The Debtor believes that it will be very challenging to get new or

18  additional work from clients while it is still in chapter 11, meaning that the Debtor will have no

19  new revenue to offset its current overhead until the Debtor consummates a sale transaction.  A

20  sale is therefore needed to create stability, and allow the Debtor to retain both its creative and

21  production team and the business of its largest customers.  Consummating the sale as soon as

22  possible is absolutely essential for preserving continuity of the Company's knowledge base, it

23  reputation for artistic excellence, and value for creditors.

24        The Debtor can only achieve these objectives if it can fund its operations pending

25  approval and implementation of the sale.  As noted, the funding under the Approved DIP Budget

26  will only permit the Debtor to maintain its current staffing levels through mid-March at the latest.

27  It is currently projected that the Debtor will deliver the Universal project by approximately March

28  8, 2013.  Thereafter while the Debtor still will have funding from the DIP Loan through mid-

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   April, it will be on a substantially reduced basis. After delivery of the Universal project the

2   Debtor will face the prospect of having to further substantially reduce its work force.  In

3   consequence, the Debtor must have a new source of funding for its operations in place or it will

4   risk losing its core group of talented employees, its status as a leader in the VFX and CG industry,

5   and the opportunity to capitalize on the efficiencies of its international operations.   These are the

6   very factors that potential purchasers are attracted to, will use as a foundation to grow the

7   Company after the sale, and provide a basis to secure the best sale price possible for the Debtor's

8   bankruptcy estate.  Thus, it is imperative that the sale of the Debtor's assets close by mid-March.

9   If the Debtor is not able to consummate a sale of its assets within this time frame, the Debtor will

10  effectively lose the ability to preserve the present going concern value of its business, destroying

11  creditors' best hope for a meaningful recovery.

12          Accordingly, the Debtor respectfully requests that the Court hold a hearing on the Bid

13  Procedures on March 8, 2013, or as soon thereafter is convenient for the Court, so that there is

14  ample time to provide notice to parties in interest, including potential bidders, regarding the Bid

15  Procedures, the proposed Sale Hearing on March 19, 2013 and the deadline for objections,

16  conduct an Auction (if necessary) and, following the conclusion of the Sale Hearing and the entry

17  of the Sale Order, close the sale transaction.

18          **D.      The Sale Process and the Proposed Sale.**

19          The Debtor engaged Houlihan Lokey ("Houlihan Lokey") as its investment banker on

20  February 15, 2013, just two days after the Petition Date.  Houlihan Lokey immediately worked to

21  establish an accelerated sale process in light of the chapter 11 filing and the Debtor's need to

22  consummate a transaction as soon as possible in order to maintain the greatest value for creditors.

23  The Debtor's prepetition marketing process, and the Debtor's position as a leading VFX and CG

24  animation studio helped facilitate this process.  For example, Focal Point provided Houlihan

25  Lokey with the list of approximately 100 parties previously contacted in the summer and fall of

26  2012, and background on which parties conducted diligence regarding a transaction.  The power

27  of the press has also been leveraged to aid the sale process and to provide as wide a notice as

28  early as possible to interested investing parties.  On February 22, 2013, a press release was sent

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    out announcing the Debtor's retention of Houlihan Lokey and the Debtor's intention to sell its

2    assets.  The release was picked up by important "industry" publications and online sources such

3    as the Hollywood Reporter, The Wrap and Yahoo! Movies.  The Debtor and the sale process have

4    also received invaluable publicity from the recent Academy Award for Visual Effects for the

5    Company's work on *Life of Pi*.

6          After reviewing the information provided by Focal Point, conducting independent

7    research and working with the Company to identify potentially interested parties, Houlihan Lokey

8    contacted a total of more than 80 strategic and financial entities regarding the proposed sale of the

9    Debtor.

10          Of these parties, as of February 28, 2013, sixteen have signed non-disclosure agreements

11    ("NDAs") and have commenced due-diligence.  Houlihan Lokey has advised all interested parties

12    that the deadline for the submission of letters of intent from bidders who desire to be the Stalking

13    Horse Bidder is March 4, 2013, and it is expected that at least one acceptable letter of intent will

14    be received by that deadline.  Indeed, the Debtor and its advisors are currently in discussions with

15    several financially-capable parties and anticipate that the terms of a transaction will be agreed

16    upon  and an asset purchase agreement executed with a Stalking Horse Bidder either prior to the

17    requested hearing on the Bid Procedures, or prior to the requested date of the Auction.

18          As discussed in further detail below, if such a deal is reached, promptly following the

19    completion of the foregoing, the Debtor will submit a signed term sheet or signed asset purchase

20    agreement to the Court and provide notice thereof to parties in interest.  The Debtor is proceeding

21    with this Motion without the term sheet or signed asset purchase agreement in hand at this time,

22    in an effort to give all parties in interest as much notice as possible about the sale terms and Bid

23    Procedures, and at the same time allow interest parties more time to submit bids, whether to

24    become the Stalking Horse Bidder or a competing bidder.

25          **E.    The Assets Subject to Sale and Purchase Price.**

26          The assets subject to sale pursuant to the APA (each as more specifically described and/or

27    limited in the APA or the schedules thereto "Acquired Assets") principally comprise: (a)

28    substantially all of the personal property, tangible and intangible, owned by the Debtor, that is

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  used in the operation of the Debtor's business; (b) permits; (c) certain executory contracts and

2  unexpired personal property leases of the Debtor to be specified by the Buyer; (d) certain

3  administrative assets, (e) certain intellectual property; and (f) the equity securities held by the

4  Debtor in certain of its subsidiaries.

5          The base purchase price proposed in the APA (the "APA Purchase Price"), which is

6  subject to further negotiation with potential purchasers and overbid at the auction, is comprised

7  of: (i) cash, payable at the closing of the sale to the Debtor's bankruptcy estate in an amount at

8  least sufficient to ensure that the Debtor's estate will not be administratively insolvent; (ii) either

9  (x) assumption of the post-petition amounts funded under the DIP Loan prior to the date of the

10  closing of the sale, in an amount of up to $17,086,000, plus up to $500,000 for the fees of the DIP

11  Lenders (the "DIP Loan Obligations"), in the form of a replacement loan or exit facility with a

12  maturity date of December 31, 2015 and substantially similar terms and conditions as the DIP

13  Loan or (y) payment in full in cash of the DIP Loan Obligations at the closing of the sale; (iii)

14  assumption of certain other liabilities described in section 2.1 of the APA (together with the DIP

15  Loan Obligations, the "Assumed Liabilities"); and (iv) payment of the Cure Amounts in respect

16  of the executory contracts and unexpired leases to be assumed and assigned in connection with

17  the sale.

18          **F.      The Bid Procedures.**

19          The Debtor is seeking approval of the proposed Bid Procedures, which are set forth on

20  Exhibit 1 hereto.  The Bid Procedures in Exhibit 1 are subject to adjustment as may be required

21  by a Stalking Horse Bidder and as approved by the Court.  The Bid Procedures are designed to

22  ensure that there is a fair and expeditious process under which the Debtor can solicit bids for the

23  sale of the Acquired Assets (as such term is defined in the APA) and, if necessary, hold an

24  Auction thereon in a manner that will ensure that the Debtor's bankruptcy estate receives

25  maximum value.  These procedures, and the timeline on which they are proposed, take into

26  account the Debtor's critical cash flow situation, and the need to retain employees and the

27  business of the studios, all of which compel the prompt completion of the sale process by mid to

28  late March.  If it is necessary to modify these procedures due to the submission of a stalking horse

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

bid, the Debtor will provide prompt notice to the Court and parties in interest.  As set forth in the Fishman Declaration, to ensure that prospective bidders were given the maximum notice possible of the proposed Bid Procedures possible under the circumstances, all sixteen (16) parties that have executed NDAs and commenced due diligence were provided with a copy of the proposed Bid Procedures (i.e. Exhibit 1 hereto) concurrently with the filing of this Motion.

The Bid Procedures describe, among other things, the assets that are potentially subject to sale, the manner in which prospective bidders may gain access to due diligence materials, the manner in which bidders may submit qualified bids and become qualified bidders, the process for conducting the Auction, the ultimate selection of the Buyer, and the date and time of the Sale Hearing.  The Court and parties in interest are referred to Exhibit 1 for the entirety of the Bid Procedures for which the Debtor seeks approval.  The following, however, is a summary of the salient provisions and the proposed timeline:

1. Due Diligence.  Any party interested in conducting due diligence is directed to contact Peter Fishman or Harry Kang of Houlihan Lokey, as indicated in Paragraph 4 of Exhibit 1.  As a condition to gaining access to confidential due diligence materials, an interested party (i) may be required to demonstrate its financial wherewithal to make a Qualified Bid (defined below), and (ii) must execute a confidentiality agreement, in form and substance reasonably acceptable to the Debtor.  The Debtor may limit, restrict or condition access to confidential information as further described in Paragraph 7 of Exhibit 1.  The Debtor makes no representations and warranties regarding any information provided, except as it may agree in a definitive asset purchase agreement.

2. Consideration of Bids.  Any party wishing to bid for assets at the Auction (a "Prospective Bidder") must have first submitted an initial, qualified bid that satisfies the requirements set forth in paragraph 4(a) below (a "Qualified Bid").  A bidder who submits a bid in accordance with the specified procedures is a "Qualified Bidder."

3. Submission of a Qualified Bid.  To become a Qualified Bidder, a Prospective Bidder must submit a Qualified Bid in writing to the Debtor, the DIP Lenders, and counsel for the members of the Committee (collectively, the "Bid Notice Parties") on

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

or before 5:00 pm (Pacific Time) on March 12, 2013 (the "Bid Deadline").  The Debtor

will, as promptly thereafter as possible, and in any event prior to the commencement of

the Auction, notify each Prospective Bidder whether it has been deemed a Qualified

Bidder.  The Stalking Horse Bidder, if any, is deemed to have submitted a Qualified Bid

and to be a Qualified Bidder.  Service information for the Bid Notice Parties is set forth in

the Bid Procedures attached hereto as Exhibit 1.

        4.     Requirements for a Qualified Bid.  Each Prospective Bidder, by submitting

a bid, shall be deemed to acknowledge that it understands and is bound by the terms of the

Bid Procedures and the order approving the Bid Procedures.  To be designated a Qualified

Bid, a bid must be submitted prior to the Bid Deadline (a "Submitted Bid") and must

satisfy the following requirements:

    a.   A Submitted Bid must be submitted in the form of an executed purchase

        agreement in the form of the APA (Exhibit 4 hereto), fully executed by the

        Prospective Bidder, and must be black-lined off the APA to show changes

        thereto.

    b.   A Submitted Bid must provide for a purchase price that exceeds the APA

        Purchase Price by $250,000 and is comprised of at least the following: (i)

        payment of the Cure Amounts, (ii) either (x) payment in full of the DIP

        Loan Obligations in cash at the closing of the sale, or (y) assumption of the

        DIP Loan Obligations as described in section II.E above; (iii) assumption

        of all other Assumed Liabilities set forth in the APA; and (vi) cash in

        immediately available funds to be delivered to the Debtor's estate at the

        closing.

    c.   If the DIP Loan Obligations are proposed to be assumed, a fully executed

        loan agreement in the form of the DIP Loan Agreement must be submitted

        by the Prospective Bidder, and must be black-lined off the DIP Loan

        Agreement to show changes thereto.  Copies of the DIP Loan Agreement

        will be provided to Prospective Bidders.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d.  A Submitted Bid must be accompanied by a good faith deposit by wire transfer, certified or cashier's check, in the amount of five percent (5%) of the total purchase price, including any assumed obligations or liabilities (the "<u>Good Faith Deposit</u>").  Each Good Faith Deposit shall be held by counsel to the Debtor in an interest-bearing account.

e.  If not previously delivered to the Debtor, a Submitted Bid must be accompanied by an executed confidentiality agreement, in form and substance satisfactory to the Debtor.

f.  At or prior to the Bid Deadline, a Prospective Bidder must provide written evidence of an irrevocable commitment for financing, without any contingency other than the entry of the Sale Order approving Prospective Bidder as the Buyer, or other satisfactory written evidence that the Prospective Bidder has the financial ability to close the transaction contemplated in the Submitted Bid and to pay the cash component of its proposed purchase price in cash by the earlier of the closing date described in the Submitted Bid, or the "Outside Date" of March 22, 2013 set forth in the APA (the "<u>Financial Evidence</u>").

g.  The Financial Evidence shall also include evidence of the Prospective Bidder's ability to provide adequate assurance of future performance under any executory contract or unexpired lease to be assumed and assigned to the Prospective Bidder under the Prospective Bidder's proposed purchase agreement.

h.  The Submitted Bid must be accompanied by a board resolution or other similar document demonstrating the authority of the Prospective Bidder to submit, execute, deliver and close the proposed sale transaction.

i.  The Submitted Bid must include an acknowledgement and representation that the Prospective Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer,

1    (ii) has relied solely upon its own independent review, investigation, and/or

2    inspection of any documents and/or the Acquired Assets in making its bid,

3    (iii) did not rely upon any written or oral statements, representations,

4    promises, warranties, or guaranties whatsoever, whether express, implied,

5    by operation of law or otherwise, regarding the Acquired Assets, or the

6    completeness of any information provided in connection therewith or the

7    Auction, except as expressly stated in the APA, and (iv) agrees that any

8    non-disclosure agreement or confidentiality agreement entered into with

9    the Debtor shall be enforceable by the Buyer.

10    j.    All Prospective Bidders and Qualified Bidders (with the exception of the

11    Stalking Horse Bidder to the extent of the Break-Up Fee) shall bear their

12    own costs and expenses in connection with submission of bids, the

13    Auction, the sale process and preparation of those documents necessary to

14    effectuate a transfer of title of the assets purchased.

15    5.    The Debtor, in reasonable consultation with the Bid Notice Parties, will

16 determine whether a party submitting a bid (a) has demonstrated the financial capacity to

17 consummate the proposed purchase of assets and provide adequate assurance of future

18 performance in respect of the executory contracts and unexpired leases to be assigned to

19 such party, (b) is reasonably likely to consummate the contemplated transactions if

20 selected as the Buyer at the Auction, (c) has obtained the consent of, or is reasonably

21 likely to obtain the consent of, the DIP Lenders to assumption of the DIP Loan, and

22 (d) has otherwise satisfied the requirements for a Qualified Bid set forth above.

23    6.    Auction Date and Location.  If the Debtor timely receives a what the

24 Debtor, in reasonable consultation with the Bid Notice Parties, determines to be a

25 Qualified Bid from a Qualified Bidder other than the Stalking Horse Bidder, the Debtor

26 proposes that the Auction be held on March 18, 2013, or as soon thereafter as may be

27 permitted by the Court, in the offices of the Debtor's reorganization counsel, Greenberg

28 Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Angeles, California 90067-4590, at 10:00 a.m. (Pacific Time), or such other location designated by the Debtor or the Court, in reasonable consultation with the Bid Notice Parties.

7.    Auction Procedures.  If there are two or more Submitted Bids, the Debtor shall conduct the Auction in any reasonable manner that is not inconsistent with these Bid Procedures and the Bid Procedures Order, and that provides Qualified Bidders with a fair opportunity to participate, subject to the requirements set forth below:

a.    Only Qualified Bidders will be permitted to bid at the Auction.

b.    The highest or best Qualified Bid received for the Acquired Assets will be the Initial Auction Bid.  The cash component of the Initial Auction Bid must exceed by $250,000 the higher of (i) the APA Purchase Price, and (ii) any purchase price set forth in the asset purchase agreement negotiated with the Stalking Horse Bidder, if any, that is selected by the Debtor.

c.    Each Qualified Bidder must appear in person or through a duly authorized representative at the Auction.  After the announcement of the Initial Auction Bid, the Debtor will request additional bidding at the Auction.

d.    A Qualified Bidder may increase its bid as many times as it chooses, provided that each subsequent bid must exceed the prior bid for the Acquired Assets by at least $100,000.  Such increase may take the form of an all cash bid, the assumption of debt, or a combination of both.

e.    Notwithstanding the foregoing, the Stalking Horse Bidder, in lieu of exceeding the prior bid, may also match any competing bid for the Acquired Assets, and the Debtor will deem the Stalking Horse Bidder's matching bid the highest or best offer based on the Break-Up Fee that otherwise would be paid to the Stalking Horse Bidder.

f.    The Auction shall continue until the Buyer has been determined by the Debtor.  The Buyer shall be the bidder making the highest or best bid at the Auction for the Acquired Assets, to be determined in the sole but

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   reasonable discretion of the Debtor, in consultation with the Bid Notice

2   Parties.

3       g.  No bidder shall be deemed the Buyer without the prior approval of the DIP

4   Lenders.

5   In consultation with the Bid Notice Parties, the Debtor reserves the right prior to, during

6   and after the Auction (subject to review by the Bankruptcy Court at the Sale Hearing), to

7   reject any bid that is not in conformity with these Bid Procedures, the orders of the

8   Bankruptcy Court, or the Bankruptcy Code, or in the best interests of the Debtor and its

9   estate, as determined by the Debtor.

10       8.   Back–Up Bidder.  As a condition to qualifying to participate in the

11   Auction, each Qualified Bidder shall be deemed to have consented to serve as a "Back-Up

12   Bidder."  If an Auction is conducted, the party with the next highest bid after the Buyer at

13   the Auction shall be required to serve as the Back-Up Bidder, and such bid is to remain

14   open for acceptance by the Debtor and consummation by the parties up to and including

15   ten (10) business days following the Outside Date specified in the APA; provided,

16   however, that nothing herein shall be deemed to modify or otherwise alter any provision

17   in the APA, or any rights of termination set forth in sections 9.1.1 and 9.1.2 of the APA.

18       9.   Selection of Buyer.  The concluding date and time of the Auction shall be

19   stated on the record.  At the conclusion of the Auction, or as soon thereafter as practicable,

20   the Debtor, in consultation with its advisors and the DIP Lenders, will: (i) review each

21   Qualified Bid, and consider each Qualified Bid, on the basis, without limitation, of the

22   amount of the purchase price, the form of consideration being offered, the likelihood of

23   the bidder's ability to close a transaction and the timing thereof, the number, type and

24   nature of any changes to the APA requested by each bidder, and the net benefit to the

25   Debtor's estate, (ii) identify the highest or best offer submitted for the Acquired Assets

26   received at the Auction (the "Prevailing Bid"), (iii) designate the party that submitted the

27   Prevailing Bid as the Buyer, and (iv) identify the Back-Up Bidder.

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

10.    Results of Auction. Prior to the Sale Hearing, the Debtor will file a notice indicating whether an Auction was held and, if so, summarizing the Auction and identifying the Buyer.

11.    Return of Good Faith Deposits.  Except as otherwise provided herein, all Good Faith Deposits shall be returned to each bidder not selected by the Debtor in accordance with the above procedures as the Buyer or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtor until ten (10) business days after the Outside Date.

**G.    Contracts and Leases.**

To facilitate and consummate the sale of the Acquired Assets, the Debtor seeks authority to assume and assign certain executory contracts and unexpired leases following the Auction, if any, pursuant to Section 365(f) of the Bankruptcy Code under the APA (collectively, the "Transferred Contracts").  Due to the nature of the bidding, it is impossible for the Debtor to currently identify which contracts and leases will require assumption and assignment to the Buyer.  As such, the Debtor further seeks authority to establish the following assumption and assignment procedures:

1.    Designation Deadline. At or prior to the Bid Deadline, each Qualified Bidder shall provide the Debtor with the list of contracts and leases such Qualified Bidder intends to designate as Transferred Contracts.

2.    Notices for Assigned Agreements.  As soon as practicable, the Debtor shall serve on all non-Debtor counterparties to any contract or lease (the "Contract Notice Parties") that are potentially subject to be assumed and assigned in connection with the sale of the Debtor's assets, a Contract Notice  in the form attached hereto as Exhibit 3 that identifies, to the extent applicable, (a) the contract or lease that may be an Transferred Contract, (b) the name of the counterparty to such contract or lease, (c) any applicable cure amount for such contract or lease if it becomes a Transferred Contract, and provides notice of the deadline for responses or objections to the proposed assumption and

1  assignment of the contract or lease and/or the Cure Amount with respect thereto;

2  provided, however, that the presence of a contract or lease on a Contract Notice does not

3  constitute an admission that such contract or lease is an executory contract and does not

4  bar any Qualified Bidder from removing any such contract or lease from its list of

5  Transferred Contracts.

6        3.    Objections to Assumption and Assignment of Contracts.  Other than

7  objecting to the ability of the Buyer to provide adequate assurance of future performance,

8  objections, if any, to the proposed assumption and assignment of any of the Assigned

9  Agreements, must be filed and served on the Bid Notice Parties three (3) business days

10  prior to the Sale Hearing.  Objections to the ability of the Buyer to provide adequate

11  assurance of future performance may be heard at the Sale Hearing.  If any objections are

12  received and not resolved, such objections will be heard at the Sale Hearing.

13        4.    Notice of Transferred Contracts.  As soon as practicable after the

14  conclusion of the Auction, the Debtor will file with the Court and post on the Debtor's

15  restructuring website http://www.omnimgt.com/Rhythmhues a notice identifying the

16  Buyer and stating which contracts and leases will be assumed and assigned (the

17  "Transferred Contracts List").  The Transferred Contracts List will also be served via first-

18  class mail on all non-Debtor counterparties to the contracts and leases set forth on the

19  Transferred Contracts List within three (3) business days of entry of the Sale Order,

20  together with a copy of the Sale Order.

21       To the extent that any entity does not timely object as set forth above, such entity shall be

22  (a) forever barred from objecting to the assumption and assignment of any of the Contracts

23  identified on the Contract Notice, including, without limitation, asserting any additional cure

24  payments or requesting additional adequate assurance of future performance, (b) deemed to have

25  consented to the applicable Cure Amount, if any, and to the assumption and assignment of the

26  applicable contract or lease, (c) bound to such corresponding Cure Amount, if any, (d) deemed to

27  have agreed that the Buyer has provided adequate assurance of future performance within the

28  meaning of section 365(b)(1)(C) of the Bankruptcy Code, (e) deemed to have agreed that all

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  defaults have been cured as a result or precondition of the assignment, such that the Buyer and the

2  Debtor shall have no liability or obligation with respect to any default occurring or continuing

3  prior to the assignment, (f) deemed to agree that from and after the date of the assignment the

4  applicable contract or lease shall remain in full force and effect for the benefit of the Buyer and

5  such entity in accordance with its terms, (g) deemed to have relieved the Debtor and the estate

6  from any liability for breach of such contract or lease occurring after such assignment; (h)

7  deemed to have waived any right to terminate the applicable contract or lease or designate any

8  early termination date under the applicable contract or lease as a result of any default that

9  occurred and/or was continuing prior to the assignment date, and (i) deemed to have agreed that

10  the terms of the Sale Order shall apply to the assumption and assignment of the applicable

11  contract or lease.

12  **H.    The Break-Up Fee.**

13      As set forth above, the deadline for parties in interest to submit a letter of intent,

14  indicating their interest in proceeding with a sale transaction, is March 4, 2013.  The Debtor

15  anticipates that the terms of a transaction will be agreed upon and an asset purchase agreement

16  executed with a Stalking Horse Bidder either prior to, or shortly after, the requested hearing on

17  this Motion.  Potential Stalking Horse Bidders have indicated that they will require a break-up fee

18  and certain other protections in order to enter into a binding agreement for a transaction, and

19  become a Stalking Horse Bidder.   The Debtor thus has included the Break-Up Fee in the APA to

20  give the Court and parties ample notice of this proposed bid protection, and to increase the

21  chances of executing an asset purchase agreement with a Stalking Horse Bidder.

22      Subject to any adjustment negotiated with a Stalking Horse Bidder and as approved by the

23  Court, pursuant to the APA, the Stalking Horse bidder will be entitled to a "Break-Up Fee" equal

24  to 1.5% of the APA Purchase Price, capped at $150,000.   Specifically section 9.3.2 of the APA

25  provides:

26      If this Agreement is terminated after the Closing Date because Seller consummates
       a transaction with an Upset Purchaser, Seller shall pay to Purchaser a break-up fee
27      in an amount equal to one and a half percent (1.5%) of the total Purchase Price,
       provided that such amount shall not exceed One Hundred Fifty Thousand United

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

States Dollars ($150,000) (the "**Break-Up Fee**"), which shall be paid by wire transfer of immediately available funds from and out of the proceeds of the purchase price paid for the Acquired Assets within three (3) Business Days of Seller's receipt thereof.

*See* APA, § 9.3.2.

The Debtor believes that proceeding with a Stalking Horse Bidder, if possible, is the best way to achieve a competitive auction, and enhance the ultimate sale price of the Debtor's assets. If the Debtor and the Stalking Horse Bidder execute a signed asset purchase agreement that includes the Break-Up Fee, the Debtor will provide the Court and parties in interest notice of the identity of the Stalking Horse Bidder, a copy of the Stalking Horse Bidder's asset purchase agreement, and notice of any modifications to the proposed Break-Up Fee.

## I.     Lienholders.

The Debtor is informed and believes that DIP Lenders are the only parties that may assert liens or security interests in the assets to be sold pursuant to this Motion.  The Debtor will obtain the required consent of the DIP Lenders to the sale, and has been consulting with the DIP Lenders regarding the sale process.

The Debtor has caused a search to be conducted with the California Secretary of State to obtain all of the active UCC financing statements on file against the Debtor (the "UCC Financing Statements") and identify the non-debtor parties named therein ("UCC Parties").  There are only three UCC Financing Statements – one filed by Bank of America, N.A. ("Bank of America") and two filed by General Electric Capital Corporation ("GECC").   The debt to Bank of America has been satisfied and Bank of America has indicated that it will file a termination of its UCC Financing Statement.  The GECC financing statements relate to an equipment lease that is subject to assumption and assignment, or rejection, in connection with the sale.

## J.     Proposed Sale Hearing and Related Deadlines.

The Debtor requests that the Court schedule the Sale Hearing for March 19, 2013, or as soon thereafter as the Court's calendar may permit.  The Debtor requests that the Court set the deadline to file and serve any objection and supporting evidence with respect to the proposed sale of assets free and clear of liens, claims and interests, and/or the assumption and assignment of

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

executory contracts and unexpired leases, including any objections to the proposed Cure Amount with respect thereto as <u>March 15, 2013</u> (three (3) business days prior to the Sale Hearing).  The Debtor requests that the Court set the deadline to file and serve any reply in support of such relief, and supporting evidence with respect thereto as <u>March 18, 2013</u> one (1) day prior to the Sale Hearing.  Finally, the Debtor requests that the Court hear objections regarding Buyer's ability to provide adequate assurance of future performance at the Sale Hearing.

## K.    Notice.

The Debtor respectfully requests that the Court approve the form and manner of notice described in the following paragraphs as reasonable, sufficient, and in accordance with the Bankruptcy Code and Bankruptcy Rules with respect to the relief requested in the Motion.

### 1.    Service of the Motion.[2]

The Debtor has served or is in the process of  serving this Motion and all exhibits and declarations attached hereto by email, facsimile or next business day delivery on: (a) the United States Trustee; (b) the Agent and the Lenders; (c) the non-debtor parties to the active UCC financing statements on file against the Debtor with the California Secretary of State; (e) each member of the Committee; (f) the Stalking Horse Bidder; (g) entities previously identified by the Debtor's investment bankers as potentially interested in a transaction with the Debtor; (h) the state and federal agencies required by Bankruptcy Rule 2002(j) and Local Rule 2002(b); and (i) all parties that have requested notice of matters in this case (collectively, "<u>Service Parties</u>").

### 2.    Service of the Sale and Procedures Notice.

Within one day of entry of the Bid Procedures Order, the Debtor intends to serve the Sale and Procedures Notice attached hereto as <u>Exhibit 2</u> (to which the Bid Procedures will be attached), by email, facsimile or email, facsimile or next business day delivery on the Service Parties, and by first class mail on all parties listed in the master mailing list that was filed with the Debtor's chapter 11 petition.  In addition, as required by Local Bankruptcy Rule 6004-1(f), a

---

[2]    As previously noted, all parties that have executed an NDA were provided with a copy of the proposed Bid Procedures concurrently with the filing of this Motion.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  copy of the Sale and Procedures Notice will be provided to the clerk at the time of filing, together

2  with local form 6004-2, to be published on the Court's website.

3        **3.    Service of the Contract Notice and Other Pleadings.**

4        Within one day of entry of the Bid Procedures Order, the Debtor intends to serve the

5  Contract Notice attached hereto as <u>Exhibit 3</u>, together with the attachment contemplated thereby,

6  by overnight on: (a) the non-debtor parties to the Contracts and Leases (the "<u>Contract and Lease</u>

7  <u>Parties</u>") and (b) the Service Parties.  At the time of service of the Contract Notice, the Debtor

8  also will serve the Contract and Lease Parties by first class mail with the Motion and the Sale and

9  Bid Procedures Notice.

10  **III.    LEGAL ARGUMENT**

11        **A.    The Bid Procedures Should Be Approved.**

12        Bankruptcy Code section 363(b)(1) provides: "[t]he trustee, after notice and a hearing,

13  may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

14  A debtor should be authorized to sell assets other than in the ordinary course of business pursuant

15  to Bankruptcy Code section 363(b)(1) if it demonstrates a sound business purpose for doing so.

16  *See, e.g.*, *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282, 288-89

17  (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal value is

18  realized by the estate under the circumstances. . . .  Ordinarily, the position of the trustee is

19  afforded deference, particularly where business judgment is entailed in the analysis or where

20  there is no objection."); *In re Fed. Mogul Global, Inc*., 293 B.R. 124, 126 (D. Del. 2003) (finding

21  that "a court should approve a debtor's use of assets outside the ordinary course of business if the

22  debtor can demonstrate a sound business justification for the proposed transaction").

23        The Bid Procedures provide a framework for the Debtor to entertain competing bids and,

24  if the Debtor receives such bids, to conduct the Auction in a fair and open fashion that will

25  encourage participation by financially capable bidders.  The Bid Procedures also set forth a

26  schedule for achieving these objectives in an expeditious manner.  In particular, this schedule

27  takes into consideration the dire financial condition of the Debtor and the urgent need to close a

28  sale quickly to preserve the going concern value of the business, and the Debtor's relationship

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   with the studios.

2        Bid procedures are appropriate when they provide a benefit to the estate, by maximizing

3   the value of its assets, and enhancing competitive bidding.  *See Calpine Corp. v. O'Brien Envtl.*

4   *Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999).  The

5   Debtor respectfully submits that a sale pursuant to the APA, subject to the opportunity for parties

6   to present higher and better bids pursuant to the Bid Procedures, is appropriate, and will ensure

7   that the estate is receiving maximum value, which is the paramount goal in any proposed sale of

8   estate property.  *See, e.g.*, *Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (recognizing that the

9   Bankruptcy Code's general policy is "maximizing the value of the bankruptcy estate.").

10       Further, the Debtor respectfully submits that the proposed Bid Procedures are fair and

11  reasonable, and consistent with those procedures previously approved in numerous other chapter

12  11 cases.  *See, e.g.*, *In re Station Casinos, Inc., et al.*, Case No. 09-52477 (GWZ) (Bankr. D. Nev.

13  June 4, 2010); *In re Advanced Materials, Inc., et al.*, Case No. 09-16548 (TA) (Bankr. C.D. Cal.

14  July 2, 2009); *In re Fleetwood Enters., Inc., et al.*, Case No. 09-14254 (MJ) (Bankr. C.D. Cal.

15  March 10, 2009); *In re Care Level Mgmt. Group, LLC, et al.*, Case No. 08-12913 (MT) (Bankr.

16  C.D. Cal. May 7, 2008); *In re VI Acquisition Corp.*, Case No. 08-10623 (KG) (Bankr. D. Del.

17  Apr. 3, 2008); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008);

18  *In re Global Home Prods., LLC.*, Case No. 06-10340 (KG) (Bankr. D. Del. April 10, 2006).

19   **B.    The Proposed Form and Manner of Notice of the Proposed Sale and the Bid
20           Procedures Is Reasonable and Appropriate.**

         Pursuant to Bankruptcy Rules 2002(a)(2), 2002(c)(1), and 6004(a), a debtor in possession

21  is required to notify its creditors of any proposed sale of its assets, including a general description

22  of the assets to be sold and a disclosure of the time and place of an auction, the terms and

23  conditions of the sale, and the deadline for filing any objections.  The Debtor respectfully submits

24  that the Sale and Procedures Notice fully complies with Bankruptcy Rules 2002 and 6004 and

25  Local Rule 6004-1, provides adequate and appropriate notice of the relief requested in this

26  Motion, and sufficient information to enable interested parties to submit Qualified Bids and

27  participate in the Auction.  The Debtor further submits that service of the Sale and Procedures
28

1   Notice by email, facsimile or next business day delivery on the Service Parties, and by first class

2   mail on the master mailing list as proposed in Section II.K.2 above will provide adequate and

3   appropriate notice of the proposed sale of assets of the Debtor free and clear of liens, claims and

4   interests.

5         **C.**       **The Proposed Sale of Assets Should Be Approved as a Sound Exercise of the**
6                              **Debtor's Business Judgment.**

7         Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that a debtor in

8   possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

9   business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Courts repeatedly have held that a

10   bankruptcy court should authorize a debtor to use or sell estate property under section 363(b)(1)

11   whenever the request is supported by some rational, articulated business purpose.  *See, e.g*.,

12   *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Continental Air Lines,*

13   *Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir.

14   1983); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1987).  This

15   was explained by the Bankruptcy Appellate Panel for the Ninth Circuit in *In re Walter*:

16         [T]here must be some articulated business justification for using, selling, or leasing
      the property outside the ordinary course of business ....  Whether the proffered
17         business justification is sufficient depends on the case.  As the Second Circuit held
      in *Lionel*, the bankruptcy judge should consider all salient factors pertaining to the
18         proceeding and, accordingly, act to further the diverse interests of the debtor,
      creditors and equity holders, alike.

19
*Id.* (quoting *In re Continental Air Lines, Inc.*, 780 F.2d at 1226).  *See also In re Ernst Home Ctr.*,

20
21   209 B.R. 974, 979 (Bankr. W.D. Wash. 1997) ("The Court may approve the FADCO Transaction

22   if [the debtor] has established some articulated business justification for the transaction.")

23   (internal quotations omitted).

24         Where a debtor in possession proffers a rational justification, "the bankruptcy court should

25   presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in

26   the honest belief that the action taken was in the best interests of the bankruptcy estate."  *In re*

27   *Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007).  Moreover, under the

28   "business judgment rule," there is a presumption that, where the debtor's appropriate governing

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

authority implements and follows fair procedures in making a decision, it acts in good faith and for a rational business purpose. *See, e.g.*, *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The board of directors is in the business of running the corporation. If the procedures utilized by the directors are applied fairly, and if the directors do not violate any of their fiduciary duties, then, under the business judgment rule their decision will not be second-guessed.") (citations omitted).

Bankruptcy Code section 363 does not require that the Court substitute its own business judgment for that of the debtor. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986). Rather, the Court should ascertain whether the debtor has articulated a valid business justification for the proposed transaction. *See, e.g.*, *Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980). This is consistent with the "broad authority to operate the business of the debtor ... [which] indicates congressional intent to limit court involvement in business decisions by a trustee ... [so that] a court may not interfere with a reasonable business decision made in good faith by a trustee." *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

A sale of significant assets of a debtor during the early stages of a case is justified if (1) there would be substantial decrease in value if the assets are not sold immediately, (2) existing customers and vendors would be reluctant to continue to do business with a company in a tenuous financial condition, and (3) the company would be unsustainable as a going concern due to lack of operating capital. *See In re Med. Software Solutions*, 286 B.R. 431, 331 (Bankr. D. Utah 2002). All three factors are present in this case. The Debtor's projections show that the cash its operations will generate for the next 45 days is significantly less than the cash needed to pay the Debtor's ongoing expenses, and the financing under the DIP Loan will only permit the Debtor to sustain its existing operations through mid-March. Further, the Debtor believes that it will be very challenging to get new or additional work from clients while it is still in chapter 11, meaning that the Debtor will have no new revenue to offset its current overhead until the Debtor consummates a sale transaction. Thus, the Debtor has a very narrow window in which it can use

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

a sale transaction to preserve its internal business operations and its position as a leading provider of VFX and CG services for the entertainment industry.

Continued operation of the Debtor as a going concern is critical to maximizing value for creditors.  The Debtor has a highly resourceful creative and productive team that offers a wide range of VFX and CG animation services.  This team has been essential to the Debtor's ability to deliver the shots due under its projects with Universal and Fox, and is viewed as a key asset by potential purchasers.  The Debtor believes that the only chance of keeping this team together, notwithstanding the potential concerns that have been created by the Debtor's recent financial challenges and its chapter 11 filing, is based on providing employees, clients, and potential purchasers with reasonable certainty that a sale transaction will be implemented quickly.  The major players in the entertainment industry, and the Debtor's employees, need to know that a transaction is moving forward, and that the Debtor's operations will soon be fully funded, stable and operating outside of bankruptcy.  Therefore, the Debtor has demonstrated sound business justification to sell the Acquired Assets pursuant to the APA.   Moreover, to the extent there is any doubt in this regard, subjecting the Debtor's assets to overbid pursuant to the Auction will confirm that the Debtor is maximizing value.

**D.**    **Assumption and Assignment of the Contracts and Leases Is Appropriate.**

The Bankruptcy Code provides, in pertinent part, that a trustee or debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) sets forth the requirements for assuming an unexpired lease or executory contract, providing in pertinent part that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

  (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

  Section 365(f) of the Bankruptcy Code provides the authority for the Debtor to assign executory contracts and unexpired leases that are assumed by the Debtor as follows:

  (1) [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

  (2) The trustee may assign an executory contract or unexpired lease of the debtor only if —

   (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

   (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(1) & (2).

  **1. The Business Judgment Test is Satisfied.**

  Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor's decision to assume an unexpired lease or executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Pomona Valley Med. Group, Inc.*, 476 F.3d at 670; *In re Chi-Feng Huang*, 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982).

  Here, the Debtor has determined that assuming and assigning the executory contracts and unexpired leases designated by the Buyer is a sound exercise of its business judgment. Assumption and assignment of these contracts and leases will enable the Debtor to consummate the proposed sale and generate substantial value for the estate. Moreover, the Debtor will not have an independent use for such contracts and leases subsequent to the sale.

  The Debtor will be serving Contract and Lease Parties with the Contract Notice. The

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

Contract Notice will list all of the executory contracts and leases that may be assumed and

assigned.  For each contract or lease, the Contract Notice will specify the dollar amount, if any,

that the Debtor believes must be paid in order to cure any and all existing defaults under such

contract or lease, and compensate the counterparty with respect thereto.  The Contract Notice will

advise the Contract and Lease Parties that if they believe a contract or lease is in default, and that

such default will not be cured by payment of the specified amount, if any, that it should promptly

provide evidence substantiating its position to the Debtor and timely file an objection to the

Motion.

**2.      Parties will be Provided With Adequate Assurance of Future Performance.**

The Debtor has also satisfied the requirements for assumption and assignment pursuant to

section 365(f)(2) of the Bankruptcy Code.  The financial capability of and willingness to perform

the post-assignment obligations under the Assigned Agreements by the successful bidder will

constitute sufficient "adequate assurance of future performance" to justify the proposed

assumption and assignment.  *See, e.g.*, *In re Tech Hifi, Inc.*, 49 B.R. 876, 879 (Bankr. D. Mass

1985) ("Adequate assurance of future performance with respect to the source of rent to be paid

means that the proposed assignee has the ability to satisfy the financial obligations imposed by

the lease.  An absolute guarantee, such as a letter of credit, is not required to meet this

standard."); *In re PPK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999); *In re THW

Enters., Inc.*, 89 B.R. 351, 357 (Bankr. S.D.N.Y. 1988).

The Bid Procedures require the Stalking Horse Bidder and each Qualified Bidder to

provide: (1) written evidence of a commitment for financing or other satisfactory written evidence

that the bidder has the financial ability to close sale and to pay the cash component of its

proposed purchase price, and (2) evidence of the bidder's ability to provide adequate assurance of

future performance under any executory contract or unexpired lease to be assumed and assigned

to it.

The Bid Procedures further provide that objections by a non-debtor party to assumption of

an Assigned Contract based on adequate assurance concerns (or otherwise) may be resolved at the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    Sale Hearing.

2        Accordingly, at the time of the Sale Hearing, the Debtor and the Buyer will have complied

3    with the requirements of section 365(f)(2) of the Bankruptcy Code.  The Debtor therefore

4    respectfully requests that the Court and approve the assumption and assignment of the Assigned

5    Agreements at the Sale Hearing.

6        **E.**    **Assumption and Assignment of More Than 100 Contracts and Leases
         Pursuant to the Motion Is Appropriate, As Is Notice Thereof Pursuant to the
7        Contract Notice.**

8        The Debtor requests herein authority to seek the assumption and assignment of more than

9    100 executory contracts and unexpired leases in this Motion, without the necessity of filing

10   separate, additional motions for such purpose.  Further, the Debtor respectfully requests that it be

11   permitted to serve a single Contract Notice pursuant to the Bid Procedures, attaching an

12   alphabetized list containing more than 100 executory contracts and unexpired leases, rather than

13   serving multiple notices in increments of 100.

14       Bankruptcy Rule 6006(f) provides that a debtor in possession may seek to assume and

15   assign multiple contracts and leases in a single motion, but Rule 6006(f)(6) generally provides

16   that any such motion may not seek relief with respect to more than 100 contracts and leases in a

17   single motion.  Nevertheless, the 2007 Advisory Committee Notes to Bankruptcy Rule 6006(f)

18   makes clear that the Court has the authority to waive any of the requirements of that Rule:  "An

19   omnibus motion to assume, assign, or reject multiple executory contracts and unexpired leases

20   must comply with the procedural requirements set forth in subdivision (f) of the rule, underline the

21   court orders otherwise." 10 Collier On Bankruptcy P. 6006 App. 6006[6] (16th ed. rev. 2012)

22   (emphasis added).[3]  Accordingly, bankruptcy courts have authorized the assumption or

23   assumption and assignment of more than 100 contracts and leases in a single motion.  *See In re*

24   *Old Carco LLC*, 406 B.R. 180, 209 (Bankr. S.D.N.Y. 2009) (citing 2007 Advisory Committee

25   Notes; holding 100 contract limit may be waived); *see also In re Nortel Networks, Inc.*, 2011

26

27

28   [3]   Courts may look to the Advisory Committee Notes for interpretive guidance.  *See, e.g.*, *In re Worcester*, 811
         F.2d 1224, 1227 (9th Cir. 1987) (relying on the Advisory Committee Notes for clarity as to a rule's application).

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    Bankr. LEXIS 1745, at *13 (Bankr. D. Del. May 2, 2011) (waiving 100 contract limit).

2        Given that all of the contracts and leases to be assumed and assigned pursuant to this

3    Motion are going to be assumed and assigned to the same entity, that this relief is part and parcel

4    of a larger sale transaction, and that there is a limited time frame to obtain approval for the

5    transaction, the Debtor respectfully requests that it be permitted to seek assumption and

6    assignment of more than 100 contracts and leases pursuant to this Motion, rather than having to

7    file separate, additional motions in 100-contract increments.   Likewise, the Debtor respectfully

8    submits that it should be permitted to attach a single alphabetized list of more than 100 contracts

9    and leases to the Contract Notice it proposes to serve under the Bid Procedures.  The Debtor does

10   not believe that Contract and Lease Parties will have any difficulty locating their names on such a

11   list, or that filing and serving multiple Contract Notices in 100-contract increments would provide

12   them any greater notice.

13       Other than with respect to the 100-contract limit, the Debtor respectfully submits that the

14   Motion, Contract Notice, and Sale and Procedures Notice satisfy the requirements of Bankruptcy

15   Rule 6006(f), and that service thereof on the Contract and Lease Parties as proposed herein will

16   provide adequate and appropriate notice of the proposed assumption and assignment of executory

17   contracts and leases pursuant to the Motion.

18       **F.    The Break-Up Fee Should be Approved.**

19       As discussed, the APA requires pre-approval of the "Break-Up Fee," which is comprised

20   of a break-up fee equal to 1.5% of the APA Purchase Price, capped at $150,000.

21       The appropriateness of a break-up fee and expense reimbursement to encourage bidding

22   has been widely recognized by courts. As one court noted, "[b]reak-up fees are important tools to

23   encourage bidding and to maximize the value of the debtor's assets. . . .  In fact, because the

24   directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to

25   discharge the directors' duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. 650,

26   659-60 (S.D.N.Y. 1992) (emphasis in original); *see also id.* at 661 (stating that break-up fees can

27   prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *see*

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  *also In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives

2  such as "[b]reakup fees . . . may 'be legitimately necessary to convince a "white knight" to enter

3  the bidding by providing some form of compensation for the risks it is undertaking'") (citation

4  omitted); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such

5  fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped

6  around for a higher bid from another bidder who would capitalize on the initial bidder's (i.e.,

7  'stalking horse's') due diligence.").  As a consequence, bankruptcy courts frequently approve

8  break-up or "topping fees" and expense reimbursement in connection with proposed bankruptcy

9  sales.  *See, e.g.*, *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 33 (2d

10  Cir. 2003) (affirming approval of break-up fee of the higher of (i) $100,000 or (ii) one-half the

11  difference between the stalking horse bidder's purchase price and the actual sale price, where the

12  purchase price was $3.1 million).

13      The Debtor has been marketing its assets for several months, with the assistance of three

14  different investment bankers.   The Debtor's initial efforts to sell its assets outside of bankruptcy

15  were unsuccessful, but in-depth discussions regarding a transaction are ongoing with several

16  financially-capable parties.  Potential purchasers have indicated that they will require a break-up

17  fee and certain other protections to enter into a binding transaction and proceed as the Stalking

18  Horse Bidder.  The Debtor believes that these protections are reasonable in light of the size of the

19  transactions and the exigencies of the process, and has included the Break-Up Fee in the APA to

20  give the Court and parties ample notice of this proposed bid protection, and to increase the

21  chances of executing an asset purchase agreement with a Stalking Horse Bidder.   The Debtor

22  believes that proceeding with a Stalking Horse Bidder (that may require customary bid

23  protections) is the best way to achieve a competitive auction, and enhance the ultimate sale price

24  of the Debtor's assets.

25      If the Debtor and Stalking Horse Bidder execute a signed asset purchase agreement that

26  includes the Break-Up Fee, the Debtor will provide the Court and parties in interest notice of the

27  identity of the Stalking Horse Bidder, the Stalking Horse Bidder's asset purchase agreement, and

28  of any modifications to the proposed Break-Up Fee.   Moreover, in the event that the Debtor

1  proceeds with a Stalking Horse Bidder at the Auction, there is no detriment to the estate in

2  including the Break-Up Fee in the APA.  Currently, the cash component of the Initial Bid at the

3  Auction must be $250,000 more than the purchase price negotiated with the Stalking Horse

4  Bidder.  The Break-Up Fee cannot exceed $150,000.  Thus, the estate will realize, at a minimum,

5  $100,000 in additional consideration beyond the APA Purchase Price even if it is required to pay

6  the Break-Up Fee.

7          **G.**      **The Sale of the Acquired Assets Free and Clear of All Liens, Claims,**

8                  **Encumbrances, and Interests Pursuant to Section 363(f) Is Permitted Under**
                **the Circumstances.**

9        In accordance with the APA, the Debtor requests that the sale of assets to the Buyer be

10  free and clear of any and all liens, claims and interests in accordance with section 363(f) of the

11  Bankruptcy Code, with any such liens, claims and interests to attach to the proceeds of the sale

12  with the same validity, priority, and extent as existed prior to the sale.  Pursuant to Section 363(f),

13  a debtor may sell property free and clear of liens, claims and interests if one of the following five

14  conditions is satisfied:

15       1.     applicable nonbankruptcy law permits sale of such property free and clear
of such interest;

16       2.     such entity consents;

17       3.     such interest is a lien and the price at which such property is to be sold is
greater than the aggregate value of all liens on such property;

18       4.     such interest is in bona fide dispute; or

19       5.     such entity could be compelled, in a legal or equitable proceeding,
to accept a money satisfaction of such interest.

20  11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive,

21  satisfaction of any one of its five requirements will suffice to warrant approval of the sale of the

22  Debtor's assets "free and clear."  *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del.

23  2002).

24        Under section 363(f)(2) of the Bankruptcy Code, a debtor in possession may sell estate

25  property free and clear of liens, claims and interests if the persons or entities asserting them

26  consent.  Here, there are only three known entities that may assert liens on the assets to be sold.

27  First, there are the DIP Lenders.  The assets will only be sold in a transaction approved by the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

DIP Lenders, to a purchaser that agrees to assume the Debtor's liabilities under the DIP Loan.

Second, Bank of America is no longer owed any money and has indicated that it will file a

termination of its UCC Financing statement.  GECC, the other lienholder of record is an

equipment lessor, and its leases are subject to be assumed and assigned, or rejected, in connection

with the sale.

To the extent that any other party asserting a lien, claim or interest receives notice of this

Motion and does not file a timely written objection hereto, such party should be deemed to have

consented to the sale of the assets free and clear of its asserted Lien.  *See In re Channel One

Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).  To the extent that any objection is

received to this Motion on the basis that the proposed sale of assets cannot be free and clear of

liens, claims and interests pursuant to section 363(f), the Debtor reserves the right to argue that

any of the other bases for a sale "free and clear" under section 363(f) apply.  Consequently and in

the absence of any such objection, the proposed sale free and clear of all liens, claims,

encumbrances, and interests satisfies section 363 of the Bankruptcy Code.

## H.    The Court Should Find the Sale Is in Good Faith.

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is

required to make a finding with respect to the 'good faith' of the purchaser."  *In re Abbotts

Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).  The purpose of such a finding is to facilitate

the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for

purchasers of a debtor's property when the purchase is made in "good faith."  Section 363(m)

provides as follows:

> (m)    The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not affect the
> validity of a sale or lease under such authorization to an entity that purchased or
> leased such property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m); *see also Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 279 (9th Cir. 1992).

Section 363(m) of the Bankruptcy Code serves the important purposes both of

encouraging good faith transactions and of preserving the finality of the bankruptcy court's orders

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   unless stayed pending appeal.  *Abbotts Dairies*, 788 F.2d at 147; *Hoese Corp. v. Vetter Corp. (In*

2   *re Vetter Corp.)*, 724 F.2d 52, 54-55 (7th Cir. 1983).  As one court recognized, "[i]f purchasers at

3   judicially approved sales of property of a bankrupt estate, and their lenders, cannot rely on the

4   deed that they receive at the sale, it will be difficult to liquidate bankrupt estates at positive

5   prices."  *In re Edwards*, 962 F.2d 641, 643 (7th Cir. 1992).  That court noted that, although the

6   law balances the competing interests between lien holders and purchasers of assets of the estate,

7   it weighs such interests "heavily in favor of the bona fide purchaser."  *Id.* at 643.

8       The Debtor's assets have been marketed, and the proposed sale of the Debtor's assets will

9   be at an Auction, subject to overbids.  The Debtor has been negotiating with potential stalking

10  horse bidders in good faith and at arms' length.  All parties are represented by separate counsel.

11  To the extent that the Debtor enters into an asset purchase agreement with a Stalking Horse

12  Bidder, the Debtor will submit additional evidence regarding the arms' length negotiation of the

13  Stalking Horse Bidder asset purchase agreement.   Accordingly, the Debtor submits that the

14  proposed sale is in good faith and that the Buyer should be entitled to the protection afforded to

15  good faith purchasers under section 363(m) of the Bankruptcy Code.

16  **I.    The Court Should Waive the Stay Under Bankruptcy Rules 6004(h) and
    6006(d).**

17      Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, an order

18  authorizing the sale of property pursuant to section 363 of the Bankruptcy Code is automatically

19  stayed for fourteen days after entry of the order.  Fed. R. Bankr. P. 6004(h).  Similarly,

20  Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or

21  unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the

22  court orders otherwise.

23      The Debtor respectfully submits that a waiver of these stay provisions is justified under

24  the circumstances.  The dates and deadlines proposed for providing notice of the opportunity to

25  bid, notice of the sale, notice of the proposed assumption of executory contracts and unexpired

26  leases, and the Sale Hearing all seek to balance the needs of due process against the stark reality

27  that the Debtor needs additional funding to sustain its existing operations after completion of its

28

1  projects for the DIP Lenders, but will not receive new, revenue-generating projects from the

2  studios to offset its overhead until the sale process is completed.  That same balancing of interests

3  weighs in favor of providing that the order approving the transaction be immediately effective.

4  **IV.    <u>CONCLUSION</u>**

5    Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an

6  order granting the Motion and such other and further relief as is appropriate under the

7  circumstances.

8  DATED: March 1, 2013      GREENBERG GLUSKER FIELDS CLAMAN
            & MACHTINGER LLP
9

10             By:*/s/ Courtney E. Pozmantier*

11              COURTNEY E. POZMANTIER
            Proposed General Bankruptcy Attorneys for

12              Debtor and Debtor in Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## DECLARATION OF JOHN PATRICK HUGHES

I, John Patrick Hughes, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the President and Chief Financial Officer of Rhythm And Hues, Inc., a California corporation, the debtor and debtor in possession in the above referenced Chapter 11 case (the "Debtor", the "Company").  I am one of the founders of the Company, and have been responsible for and have overseen the overall operations of the Company since its establishment. In this capacity, I am familiar with the history, day-to-day operations, business and financial affairs of the Company.  Except as otherwise indicated, all facts as set forth in this declaration are based upon my personal knowledge, my discussion with other employees and representatives of the Company, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition.  If I were called to testify, I would and could testify competently to the facts set forth in this declaration.

2.      This Declaration is submitted in support of the Debtor's motion for orders (1) approving sale of the Debtor's assets under asset purchase agreement free and clear of liens, claims and interests, (2) approving assumption and assignment of unexpired leases and executory contracts, (3) approving certain bid and auction procedures, include a break-up fee, (4) setting date and time for hearing on proposed sale, and (5) approving form and notice of auction and sale hearing (the "Motion").

3.       The detailed factual background relating to the Debtor and the commencement of this case is set forth in the declaration that I submitted in support of the Debtor's "first-day" motions, and in the declaration submitted by John F. Hedge of Scouler & Company, the Debtor's Chief Restructuring Officer ("CRO").  *See* Docket Nos. 8 and 9, respectively.

4.      In an effort to strengthen the Company's financial position, we hired Focal Point Partners ("Focal Point") in June 2012 to explore strategic options for the Company, including a sale of some or all of its assets.  Focal Point was also tasked with trying to find additional capital to sustain the Company's operations during an anticipated period when it was felt current jobs would be unable to carry the costs of doing so.  Focal Point established an electronic "data room"

and took other steps typical in the marketing of middle-market companies such as the Debtor, including the preparation of a "pitch book" touting the Company which was distributed to potential buyers.

5.      Focal Point solicited over 100 potential strategic and financial buyers for the Company.  Approximately 12 entities submitted expressions of interest in the Debtor, and performed varying levels of due diligence regarding a transaction with the Debtor.  One entity submitted a confidential offer for the purchase of the Debtor's assets, but after considering the offer we determined the total consideration offered was ultimately too low to allow the Company to proceed with the transaction.

6.      In October 2012 the Company retained The Hina Group, a Chinese investment bank, to supplement Focal Point's efforts in Asia.  Ultimately, there were no viable opportunities identified through this process.

7.      Shortly before the Petition Date, an entity agreed to purchase the stock of the Company for a nominal amount, assume the DIP Loan, and pledged to invest $30 million in the Company.   This entity was unable to close the transaction, which left the Company in a dire situation.

8.      Specifically, the Company was not in a position to complete its current projects for WB, Universal, Fox and Legendary at the bid amounts of these projects.  We needed additional funding to pay the costs (mostly labor) for the projects to be completed, or the Company would default under its agreements with these entities.  Moreover, because of what we believe to be temporary softness in the market for VFX work, the Company does not have enough new work to allow it to absorb the overages needed to pay for completion of these existing contracts.

9.      Together with our CRO and other advisors, we have worked with Legendary, WB, Universal and Fox in an attempt to restructure the agreements with Legendary, WB, Universal and Fox or to provide a method by which sufficient funds can be injected into the Company so that it can finish the projects and maintain its operations until it can attract additional projects. The result of these discussions is the DIP Loan being provided to the Company by Universal and Fox, jointly, and the agreement with Legendary described below.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

10.    Based on the foregoing, the Company's Board of Directors and I concluded that the best course of action would be to file chapter 11 to secure the DIP Loan and further stabilize the Company's operations pending a sale of the Company's assets in chapter 11 or implementation of another restructuring solution.

11.    The DIP Loan provided by Universal and Fox principally funds the work the Debtor is performing for them, and certain expenses associated with the Debtor's chapter 11 case. The funding under the DIP Loan is not enough to sustain the Debtor's operations in the long-term or allow the Debtor to perform under its contracts with other studios and production.

12.    To that end, the Debtor recently reached an agreement with Legendary, which was approved by the Court on February 20, 2013, under which Legendary will pay approximately $4,961,751 to the Debtor to finish its work on the film the *Seventh Son*.   Legendary is not participating in the DIP Loan and will make payments to the Company pursuant to a court order (the "Change Order").   I believe the Debtor's entry into the Change Order was very beneficial, as it allows for the payment of wages owing to employees related to the Legendary project, and will provide needed post-petition work for the Debtor.

13.    However, while the Company has been able to negotiate funding to complete its existing projects with Universal, Fox and Legendary, any delay in delivery of the Debtor's work on these projects, or increase in the cost of the Debtor's overhead, will upset the delicate financial balance the Debtor has achieved.   Unfortunately, it has been my experience that delays in delivery and fluctuations in overhead are a natural part of the Debtor's business due to the highly technical nature of the Debtor's work and uncertainties inherent in the creative process.   The approved budget under the DIP Loan (the "Approved DIP Budget") contemplates funding for operations which allow the Company to complete its existing projects for Universal and Fox.   *See* Docket No. 7, Exhibit A.   However, as this work is finished, the staffing levels required by the Company are projected to decrease significantly commencing in mid-March.   *See id.*   At that time, the Debtor will face the prospect of further reducing its workforce as it begins to exhaust its funding under the Approved DIP Budget.   *See id*.   Therefore, to preserve the viability of the Debtor's current operations, any sale would ideally take place by mid-March.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

14.    The Company must also preserve its international operations.  Since opening its Vancouver office in September of 2011, it has now become widely known that the Company has a facility in a government-subsidized location, and Company has been included in considerably more requests for bids as a result.  Furthermore, because the Company's Asian facilities are very efficient economically due to lower labor costs, the Company will be able to further lower costs and increase its profits as it increases the amount of the work it does in Asia.  The Company's viability in the international market is crucial to the going concern value of Company.

15.    The Company, the Debtor's advisors and investment banker have explored the restructuring alternatives available to the Company.  It has become clear that because of the Company's liquidity constraints and lack of long-term financing, a sale of the Debtor's assets is the only way for the Company to successfully reorganize.  The Debtor believes that it will be very challenging to get new or additional work from clients while it is still in chapter 11, meaning that the Debtor will have no new revenue to offset its current overhead until the Debtor consummates a sale transaction.  A sale is therefore needed to create stability, and allow the Debtor to retain both its creative and production team and the business of its largest customers.  Consummating the sale as soon as possible is absolutely essential for preserving continuity of the Company's knowledge base, it reputation for artistic excellence, and value for creditors.

16.    The Debtor can only achieve these objectives if it can fund its operations pending approval and implementation of the sale.  As noted, the funding under the Approved DIP Budget will only permit the Debtor to maintain its current staffing levels through mid-March at the latest. It is currently projected that the Debtor will deliver the Universal project by approximately March 8, 2013.  Thereafter while the Debtor still will have funding from the DIP Loan through mid-April, it will be on a substantially reduced basis. After delivery of the Universal project the Debtor will face the prospect of having to further substantially reduce its work force.  In consequence, the Debtor must have a new source of funding for its operations in place or it will risk losing its core group of talented employees, its status as a leader in the VFX and CG industry, and the opportunity to capitalize on the efficiencies of its international operations.  These are the very factors that I believe potential purchasers are attracted to, will use as a foundation to grow

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   the Company after the sale, and provide a basis to secure the best sale price possible for the

2   Debtor's bankruptcy estate. Thus, it is imperative that the sale of the Debtor's assets close by

3   mid-March. If the Debtor is not able to consummate a sale of its assets within this time frame, the

4   Debtor will effectively lose the ability to preserve the present going concern value of its business,

5   destroying creditors' best hope for a meaningful recovery.

6       I declare under penalty of perjury under the laws of the United States that the foregoing is

7   true and correct. Executed at El Segundo, California on this 2nd day of March 2013.

8

9

10                   JOHN PATRICK HUGHES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

74262-00017/1906426.7         5         DECLARATION OF JOHN P. HUGHES

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## DECLARATION OF PETER S. FISHMAN

I, Peter S. Fishman, declare:

1.      I am a Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey") and am duly authorized to make this Declaration on behalf of Houlihan Lokey.  The facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

2.      This Declaration is submitted in support of the motion of Rhythm And Hues, Inc., debtor and debtor in possession (the "Company" or the "Debtor"), for orders (1) approving sale of the Debtor's assets under asset purchase agreement free and clear of liens, claims and interests, (2) approving assumption and assignment of unexpired leases and executory contracts, (3) approving certain bid and auction procedures, include a break-up fee, (4) setting date and time for hearing on proposed sale, and (5) approving form and notice of auction and sale hearing (the "Motion").[6]

3.      Established in 1970, Houlihan Lokey is a global investment banking/financial advisory firm, with 14 offices in the United States, Europe and Asia and more than eight hundred employees.  Houlihan Lokey provides corporate finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring.  In 2010 Houlihan Lokey ranked as the No. 1 M&A advisor for U.S. transactions under $1 billion, according to Thomson Reuters.  The firm is one of the leading providers of M&A fairness opinions and has one of the largest worldwide financial restructuring practices of any investment bank.  Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

4.      Through its Financial Restructuring Group, Houlihan Lokey is one of the leading advisors and investment bankers to troubled companies, both inside and outside of bankruptcy, as well as to bondholders, banks, other secured and unsecured creditors, official creditor committees, acquirers, equity sponsors and other parties-in-interest involved with financially

---

[6]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

1    challenged companies.  Houlihan Lokey's Financial Restructuring Group has approximately 150

2    professionals dedicated to providing restructuring and other financial services to distressed

3    companies.

4          5.     Houlihan Lokey was retained by the Debtor as its Investment Banker on or about

5    February 15, 2013, two days after the filing of this case.  Houlihan Lokey's team in this

6    engagement includes professionals from the firm's Financial Restructuring Group, each with

7    significant experience in distressed transactions, both in and out-of- court, as well as professionals

8    from the firm's Media and Entertainment Group with significant experience, expertise and

9    relationships in the media space in which the Debtor operates.

10         6.     Given the Debtor's serious liquidity constraints, which precipitated the filing of

11    this Chapter 11 case, the resulting difficulty for the Debtor in participating in bidding on new

12    projects due to its weakened financial condition, and the lack of future project backlog, there is an

13    urgent need to consummate a sale transaction as soon as possible.  Accordingly, following our

14    retention, I and my team immediately began work to establish an accelerated sale process.

15         7.     The Debtor provided us with a list of approximately 100 parties who had been

16    previously contacted by Focal Point, the Debtor's prior investment banker in an earlier effort to

17    sell the Debtor in the summer and fall of 2012.  In addition, we were provided the identities of

18    two interested parties from the earlier effort who had conducted due diligence on the Debtor and

19    its business, as well as those parties in that process who had indicated that they had no interest in

20    a transaction with the Debtor. The Houlihan Lokey team immediately began contacting and

21    meeting with interested participants in the prior process.

22         8.     Houlihan Lokey developed a list of additional potential acquirers, both financial

23    and strategic, which the firm identified through its knowledge of, and relationships, in the

24    industry, which we believed could be strong potential bidders.  As a result of the foregoing effort,

25    as of February 28, 2013, Houlihan Lokey had contacted a total of more than 80 strategic and

26    financial entities regarding the proposed sale of the Debtor.   Of these parties, as of February 28,

27    2013, sixteen have signed non-disclosure agreements ("NDAs") and have conducted due-

28    diligence in the virtual data room in which was deposited by the Debtor due diligence materials

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

about the Company, its operations, financial matters and condition, and certain legal matters. Five of those parties have conducted, or made arrangements to conduct, on-site due-diligence, including meetings with management. I plan to circulate on March 2, 2013, a copy of the proposed Bid Procedures (*i.e.*, Exhibit 1 to the Motion) to all sixteen parties that have executed an NDA and conducted due-diligence to date.

9.    The power of the press has also been leveraged to aid the sale process. On February 22, 2013, a press release was sent out announcing the Debtor's retention of Houlihan Lokey and the Debtor's intention to sell its assets. The public relations firm that sent out the press release out has kept me apprised of "media hits" regarding the release. Notable industry outlets to pick up the release include the The Wrap and The Hollywood Reporter. A true and correct copy The Wrap article regarding the Debtor's retention of Houlihan Lokey in connection with the sale of the Debtor's assets, which ran online in Yahoo! Movies on February 22, 2013, is attached hereto as Exhibit A. A true and correct copy of The Hollywood Reporter article regarding the Debtor's retention of Houlihan Lokey in connection with the sale of the Debtor's assets, which was posted on The Hollywood Reporter's website on February 22, 2013, is attached hereto as Exhibit B.

10.    The Debtor and the sale process have also received valuable publicity from the recent Visual Effects Academy Award received by one of the Company's employees for his work on *Life of Pi*.

11.    In depth discussions regarding a transaction are ongoing with several financially-capable parties. All of these parties have been advised that the deadline for the submission of letters of intent from bidders that desire to be the Stalking Horse Bidder is March 4, 2013. Based on my involvement in leading and facilitating these discussions, I anticipate that the terms of a transaction will be agreed upon and an asset purchase agreement executed with a Stalking Horse Bidder either prior to, or shortly after, the requested hearing on the Motion.

12.    Potential Stalking Horse Bidders have indicated that they will require a break-up fee and certain other protections in order to enter into a binding agreement for a transaction, which would then become the Stalking Horse Bid.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1      13.     It is my opinion that having a Stalking Horse Bid, and granting customary breakup

2   fees and other protections to a Stalking Horse Bidder, will, in this situation, be a positive

3   development in encouraging other bidders to participate, and in stimulating a competitive bidding

4   situation that will maximize the benefit to the estate from a transaction.  In my experience

5   reasonable and customary breakup fees and initial overbid protections result in more spirited

6   bidding and pay for themselves in the event that bids over and above the Stalking Horse bid are

7   submitted at the auction.

8      I declare under penalty of perjury under the laws of the United States of America that the

9   foregoing is true and correct.

10      Executed this 2nd day of March, 2013 at Los Angeles, California.

11

12

13                                               PETER S. FISHMAN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# EXHIBIT "A"

# YAHOO! MOVIES

## Rhythm & Hues Taps Financial Advisory Firm to Help With Sale



By Brent Lang | The Wrap – Fri, Feb 22, 2013 1:32 PM EST

Rhythm & Hues Studios has engaged  financial advisory firm Houlihan Lokey to help it find a buyer.

The Oscar-winning special-effects company filed for Chapter 11 bankruptcy protection last week after a proposed sale to Prime Focus collapsed at the eleventh hour. The Indian-based effects company was unable to line up funding to complete the deal, an individual with knowledge of the situation told TheWrap, although it remains interested in possibly acquiring the company.

In announcing the Houlihan Lokey appointment, Rhythm & Hues said it is moving quickly to complete a sale of its assets and has identified several parties that are interested in acquiring it.  Rhythm & Hues said it wants to find a stalking-horse bidder, which would allow it to avoid an auction of its assets, potentially maximizing the price the company receives.

Rhythm & Hues is currently nominated for two visual-effects Oscars for its work on "Life of Pi" and "Snow White & The Huntsman," and is considered a leader in its field. However, the visual-effects business is a notoriously low-margin one. In California, where Rhythm & Hues is headquartered, visual-effects companies have found themselves at a disadvantage to other foreign companies that can offer more generous tax subsidies for studios and cheaper labor.

Rhythm & Hues reports in its Chapter 11 filings that it has  $27.5 million in assets and roughly  $33.8 million in liabilities. The company laid off more than 250 employees last week.

Universal Pictures and 20th Century Fox loaned up to $17 million to Rhythm & Hues so it could continue working on two big-budget film releases while under bankruptcy protection, according to court filings. Universal has its futuristic adventure "R.I.P.D." at the company and Fox has the children's adventure "Percy Jackson: Sea of Monsters" there.

In addition, Legendary Pictures is loaning the company nearly $5 million to work on its medieval action film "Seventh Son," according to court documents. Rhythm & Hues is an investor on that film.

Peter S. Fishman, director at Houlihan Lokey, will work with John Hedge of Scouler & Company, who is serving as the company's chief restructuring officer to guide Rhythm & Hues hrough the sale process. Bob Baradaran and Brian L. Davidoff of Greenberg Glusker will continue to serve as legal counsel to Rhythm & Hues.

Related Articles:

At Rhythm & Hues, We Could Be Going From the Frying Pan Into the Fire
At Rhythm & Hues All-Staff Meeting: Blunt Talk About Layoffs, Foreign Subsidies
Rhythm & Hues Filing for Bankruptcy After Deal With Prime Focus Collapses

Copyright © 2013 Yahoo! Inc. All rights reserved.    /

# EXHIBIT "B"

**Source URL:** http://www.hollywoodreporter.com/news/rhythm-hues-hires-houlihan-lokey-423491

# Rhythm & Hues Hires Houlihan Lokey

11:33 AM PST 2/22/2013 by Carolyn Giardina

[2]



## The firm will serve as lead financial advisor to the VFX house in the sale of the company.

Rhythm & Hues Studios — the VFX house behind the CG tiger in Oscar-nominated *Life of Pi* -- has tapped financial advisory firm Houlihan Lokey to serve as lead financial advisor in the sale of the company.

Rhythm & Hues filed for Chapter 11 bankruptcy protection Feb. 13 and is aiming to quickly complete a sale of its assets under the Bankruptcy Code. It has identified several parties who are interested in acquiring the company.

**Peter S. Fishman**, director at Houlihan Lokey, will work with **John Hedge** of Scouler & Company who is acting as the company's chief restructuring officer. **Bob Baradaran** and **Brian L. Davidoff** of Greenberg Glusker will continue to serve as legal counsel.

**STORY: The Global Forces Behind Rhythm & Hues' Bankruptcy** [5]

On Feb. 21, a judge approved $4.9 million in financing that Legendary Pictures will pay Rhythm & Hues for the completion of VFX work on their movie, *Seventh Son*. The medieval adventure film starring **Jeff Bridges** and **Julianne Moore** is being produced by Legendary Pictures and will

Case 2:13-bk-13775-NB    Doc 77    Filed 03/02/13    Entered 03/02/13 18:25:12    Desc
Main Document      Page 57 of 113

be distributed by Warner Bros.

On Feb. 15, a bankruptcy judge approved $17 million in loans from Universal and Fox, integral to the VFX house's plans to operate for the next few months as it completes work on Universal's *R.I.P.D.*, scheduled for release July 19, and Fox's *Percy Jackson: Sea of Monsters*, scheduled for Aug. 16.

Two additional Warners projects -- *300: Rise of an Empire* (schedule for release Aug. 2) and *Black Sky* -- were at Rhythm & Hues at the time of the bankruptcy filing. Warners is exploring options as to how to to have that work completed.

**Links:**
[1] http://www.hollywoodreporter.com/print/423491#disqus_thread
[2] http://pinterest.com/pin/create/button/?url=www.hollywoodreporter.com/news/rhythm-hues-hires-houlihan-lokey-423491&media=http://www.hollywoodreporter.com/sites/default/files/2013/02/life_of_pi.jpg&description=Rhythm &amp; Hues Hires Houlihan Lokey
[3] http://www.hollywoodreporter.com/news/seventh-son-rhythm-hues-seeks-422619
[4] http://www.hollywoodreporter.com/news/judge-approves-studios-loan-rhythm-421942
[5] http://www.hollywoodreporter.com/news/life-pi-house-rhythm-hues-422482

# EXHIBIT "1"

EXHIBIT 1

**Bid Procedures**

These bid procedures set forth the process by which Rhythm And Hues, Inc. (the "Debtor"), the debtor and debtor in possession in a chapter 11 bankruptcy case pending in the United States Bankruptcy Court for the Central District of California (the "Court"), No. 2:13-bk-13775 (NB), is authorized to conduct a sale by auction (the "Auction") of the Acquired Assets (as defined herein).

1.      Motion for Bankruptcy Court Approval of Sale. On March 1, 2013, the Debtor filed with the Court and served *Debtor's Motion For Orders: (1) Approving Sale Of Debtor's Assets Under Asset Purchase Agreement Free And Clear Of Liens, Claims And Interests, (2) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts, (3) Approving Certain Bid And Auction Procedures, Including A Break-Up Fee, (4) Setting Date And Time For Hearing On Proposed Sale, And (5) Approving Form Of Notice Of Auction And Sale Hearing* (the "Sale Motion"). The Sale Motion seeks (i) approval of these bid procedures (the "Bid Procedures"); (ii) authority to hold the Auction, if necessary; (iii) a hearing to approve the sale, free and clear of all liens, claims, interests and encumbrances, substantial assets of the Debtor in accordance with the asset purchase agreement attached to the Sale Motion as Exhibit 4 (the "APA"), (iv) authority to assume and assign certain executory contracts and unexpired leases; (v) approval of a break-up fee (the "Break-Up Fee") provided for in the APA, if necessary; and (vi) approval of the form of notice of these Bid Procedures, the Auction (if one is held) and the Sale Hearing.

2.      Entry of Bid Procedures Order.  The Court entered its order (the "Bid Procedures Order") approving the Bid Procedures on March [__], 2013.  *See* Docket No. __.

3.      Stalking Horse Bidder.  The Debtor's intention is to execute an asset purchase agreement with a stalking horse bidder ("Stalking Horse Bidder") prior to the Auction.  If a Stalking Horse Bidder is selected in advance of the Auction, the Bid Notice Parties and the Service Parties (as such term is defined in the Sale Motion) will be provided with notice of the identity of the Stalking Horse Bidder, a copy of the Stalking Horse Bidder's asset purchase agreement, and any modifications to these Bid Procedures necessitated by the selection of a Stalking Horse Bidder.

4.      Assets Subject to Sale Pursuant to the APA. The assets that are being sold pursuant to the APA (the "Acquired Assets") comprise (a) substantially all of the personal property, tangible and intangible, owned by the Debtor, that is used in the operation of the Debtor's business; (b) permits; (c) certain executory contracts and unexpired personal property leases of the Debtor ("Contracts and Leases") to be specified by the prevailing bidder (the "Buyer"); (d) certain administrative assets, (e) certain intellectual property; and (f) the equity

securities held by the Debtor in certain of its subsidiaries, all as more specifically described in section 1.1 of the APA.[1]

5.    Purchase Price. The base purchase price proposed in the APA (the "APA Purchase Price"), which is subject to further negotiation with potential purchasers and overbid at the Auction, is comprised of: (i) cash, payable at the closing of the sale to the Debtor's bankruptcy estate in an amount at least sufficient to ensure that the Debtor's estate will not be administratively insolvent; (ii) either (x) assumption of the post-petition amounts funded under the DIP Loan prior to the date of the closing of the sale, in an amount of up to $17,086,000, plus up to $500,000 for the fees of the DIP Lenders (the "DIP Loan Obligations"), in the form of a replacement loan or exit facility with a maturity date of December 31, 2015 and substantially similar terms and conditions as the DIP Loan or (y) payment in full in cash of the DIP Loan Obligations at the closing of the sale; (iii) assumption of certain other liabilities described in section 2.1 of the APA (together with the DIP Loan Obligations, the "Assumed Liabilities"); and (iv) payment of the Cure Amounts in respect of the executory contracts and unexpired leases to be assumed and assigned in connection with the sale.

6.    Sale Hearing. Pursuant to the Bid Procedures Order, March [19], 2013, at _:00 _.m. (Pacific Time) has been set as the date and time for the hearing (the "Sale Hearing") to approve the sale of the Acquired Assets and the assumption and assignment of executory contracts and unexpired leases of the Debtor before the Honorable Neil Bason, United States Bankruptcy Judge, or such other judge presiding over such hearing, at the United States Bankruptcy Court, Central District of California, Roybal Federal Building and Courthouse, 255 E. Temple Street, Los Angeles, CA 90012; and approving the other dates, deadlines and procedures described herein (i.e., these Bid Procedures).

7.    Due Diligence. All due diligence must be completed by an interested party prior to the deadline for submitting a Qualified Bid (defined below). Any party that wishes to conduct due diligence should promptly contact the Debtor's investment banker, Houlihan Lokey, Attn: Peter Fishman or Harry Kang, Citigroup Center, One Sansome Street, Suite 1700, San Francisco, CA 94104, (415) 273-3619.  Before the Debtor provides any confidential information to a Qualified Bidder, the Qualified Bidder shall have delivered to the Debtor a fully executed confidentiality agreement in a form reasonably acceptable to the Debtor (the "Confidentiality Agreement"). The Debtor, after consultation with its advisors and the DIP Lenders, may impose any and all limitations, restrictions or conditions upon an interested party's ability to conduct due diligence that the Debtor deems reasonably necessary to (i) avoid disruption of the Debtor's operation; (ii) preserve the value of the Acquired Assets; (iii) protect confidential, proprietary or otherwise sensitive information; or (iv) address any other concerns the Debtor has with respect to any particular factual circumstances surrounding or unique to any particular party (such as if a party is a competitor of the Debtor). The Debtor makes no representation or warranty as to the information to be provided through the due diligence process or otherwise, except to the extent

---

[1]    Any discussion or description herein of the terms of the APA (including the identification of the Acquired Assets subject to the APA) is qualified in its entirety by the terms of the APA itself, which should be reviewed in its entirety by any interested parties.

set forth in a definitive asset purchase agreement with the Buyer, or in the APA, as executed and delivered by the Debtor.

8.       Consideration of Bids. Any party wishing to bid for the Acquired Assets at the Auction (a "Prospective Bidder") must have first submitted an initial, qualified bid.  A bidder who submits a Qualified Bid in accordance with the procedures specified herein is a "Qualified Bidder."

9.       Submission of a Qualified Bid. To become a Qualified Bidder, a Prospective Bidder must submit a Qualified Bid in writing to the Debtor, the DIP Lenders, and the members of the Official Committee of Unsecured Creditors ("Committee") (collectively, the "Bid Notice Parties") on or before 5:00 pm (Pacific Time) on March 12, 2013 (the "Bid Deadline").  The Debtor will as promptly thereafter as possible, and in any event prior to the commencement of the auction, notify each Prospective Bidder whether it has been deemed a Qualified Bidder.  The Stalking Horse Bidder, if any, is deemed to have submitted a Qualified Bid and to be a Qualified Bidder.

10.      Bid Notice Parties. The service information for the Bid Notice Parties is as follows:

     a.    The Debtor: Greenberg Glusker Fields Claman & Machtinger LLP, Attn: Brian L. Davidoff, Esq., and C. John Melissinos 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067-4095, bdavidoff@greenbergglusker.com. jmelissinos@greenbergglusker.com

     b.    The DIP Lenders: Jones Day, Attn: Richard Wynne, Esq. and Lori Sinanyan, Esq., 255 South Flower Street, Fiftieth Floor, Los Angeles, CA 90071, rwynne@jonesday.com, lsinanyan@jonesday.com.

     c.    Official Committee of Unsecured Creditors:

         i.    Anthony Barcelo: Outten & Golden, LLP, Attn: Gail C. Lin, Esq., Jack Raisner, Esq. and Rene Roupinisn, Esq., 3 Park Avenue, 29th Floor, New York, New York 10016, gl@outtengolden.com, jar@outtengolden.com, rsr@outtengolden.com.

        ii.   Focal Point, LLC: The Kravitz Law Firm, Attn: Peter S. Kravitz, Esq., 29209 Canwood St., Suite 210, Agoura Hills, CA 91301, PKravitz@SolutionTrust.com.

        iii.  Warner Bros.: Peitzman Weg, LLP, Attn: Scott F. Gautier, 2029 Century Park East, Suite 3100, Los Angeles, CA 90067, sgautier@petizmanweg.com.

11.      Requirements for a Qualified Bid. Each Prospective Bidder, by submitting a bid, shall be deemed to acknowledge that it understands and is bound by the terms of the Bid

Procedures and the Bid Procedures Order. To be designated a Qualified Bid, a bid must be submitted prior to the Bid Deadline (a "Submitted Bid") and must satisfy the following requirements:

a. A Submitted Bid must be submitted in the form of an executed purchase agreement in the form of the APA (Exhibit 4 to the Sale Motion), fully executed by the Prospective Bidder, and must be black-lined off the APA to show changes thereto.

b. A Submitted Bid must provide for a purchase price that exceeds the APA Purchase Price by $250,000 and is comprised of at least the following: (i) payment of the Cure Amounts, (ii) either (x) payment in full of the DIP Loan Obligations in cash at the closing of the sale, or (y) assumption of the DIP Loan Obligations; (iii) assumption of all other Assumed Liabilities set forth in the APA; and (vi) cash in immediately available funds to be delivered to the Debtor's estate at the closing.

c. If the DIP Loan Obligations are proposed to be assumed, a fully executed loan agreement in the form of the DIP Loan Agreement must be submitted by the Prospective Bidder, and must be black-lined off the DIP Loan Agreement to show changes thereto.  Copies of the DIP Loan Agreement will be provided to Prospective Bidders.

d. A Submitted Bid must be accompanied by a good faith deposit by wire transfer, certified or cashier's check, in the amount of five percent (5%) of the total purchase price, including any assumed obligations or liabilities (the "Good Faith Deposit").  Each Good Faith Deposit shall be held by counsel to the Debtor in an interest-bearing account.  The Good Faith Deposits of all Prospective Bidders, other than the Buyer, shall be returned in accordance with the procedures set forth in paragraph 15 below.

e.  If not previously delivered to the Debtor, a Submitted Bid must be accompanied by an executed confidentiality agreement, in form and substance satisfactory to the Debtor.

f. At or prior to the Bid Deadline, a Prospective Bidder must provide written evidence of an irrevocable commitment for financing, without any contingency other than the entry of the Sale Order approving the Prospective Bidder as the Buyer, or other satisfactory written evidence that the Prospective Bidder has the financial ability to close the transaction contemplated in the Submitted Bid and to pay the cash component of its proposed purchase price in cash by the earlier of the closing date described in the Submitted Bid, or the "Outside Date" of March 22, 2013 set forth in the APA (the "Financial Evidence").

g. The Financial Evidence shall also include evidence of the Prospective Bidder's ability to provide adequate assurance of future performance under any executory contract or unexpired lease to be assumed and assigned to the Prospective Bidder under the Prospective Bidder's proposed asset purchase agreement.

h.  The Submitted Bid must be accompanied by a board resolution or other similar document demonstrating the authority of the Prospective Bidder to submit, execute, deliver and close the proposed sale transaction.

i.  The Submitted Bid must include an acknowledgement and representation that the Prospective Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the APA, and (iv) agrees that any non-disclosure agreement or confidentiality agreement entered into with the Debtor shall be enforceable by the Buyer.

j.  All Prospective Bidders and Qualified Bidders (with the exception of the Stalking Horse Bidder to the extent of the Break-Up Fee) shall bear their own costs and expenses in connection with submission of bids, the Auction, the sale process and preparation of those documents necessary to effectuate a transfer of title of the assets purchased.

The Debtor, in reasonable consultation with the Bid Notice Parties, will determine whether a party submitting a bid (i) has demonstrated the financial capacity to consummate the proposed purchase of the Acquired Assets and provide adequate assurance of future performance in respect of the Contracts and Leases to be assigned to such party, (ii) is reasonably likely to consummate the contemplated transactions if selected as the Buyer, (iii) has obtained the consent of, or is reasonably likely to obtain the consent of, the DIP Lenders to assumption of the DIP Loan, and (iv) has otherwise satisfied the requirements described above.

12.  <u>Contracts and Leases</u>. By March [11], 2013, the Debtor will file with the Bankruptcy Court and serve on both the Bid Notice Parties and the non-debtor parties to the Contracts and Leases, a notice ("Contract Notice") (a) indicating the Debtor's estimate of the amounts, if any, required to satisfy the cure and compensation requirements of Bankruptcy Code section 365(b)(1) ("<u>Cure Amount</u>") with respect to all Contracts and Leases that might be assigned in connection with a sale of the Acquired Assets, (b) providing notice that Qualified Bidders may propose to take an assignment of any of the Contracts and Leases, and (c) providing notice of the deadline for responses or objections to the proposed assumption and assignment of the Contracts and Leases, and the Cure Amount, if any, with respect thereto.  As soon as practicable after the conclusion of the Auction, the Debtor will file with the Court, serve on the affected parties, and post on the Debtor's restructuring website http://www.omnimgt.com/Rhythmhues a notice identifying the Buyer and stating which Contracts and Leases will be assumed and assigned.

13.  <u>Auction Procedures</u>. The Debtor will conduct an Auction on **March [18], 2013** in the offices of the Debtor's reorganization counsel, Greenberg Glusker Fields Claman &

Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067-4095, at 10:00 a.m. (Pacific Time), or such other location designated by the Debtor or the Court, in reasonable consultation with the Bid Notice Parties. If there are more than two Submitted Bids, the Debtor shall conduct the Auction in any reasonable manner that is not inconsistent with these Bid Procedures and the Bid Procedures Order, and that provides Qualified Bidders with a fair opportunity to participate, subject to the requirements set forth below.

a.  Only Qualified Bidders will be permitted to bid at the Auction.

b.  The highest or best Qualified Bid received for the Acquired Assets will be the Initial Auction Bid.  The cash component of the Initial Auction Bid must exceed by $250,000 the higher of (i) the APA Purchase Price, and (ii) any purchase price set forth in the asset purchase agreement negotiated with the Stalking Horse Bidder, if any, that is selected by the Debtor.

c.  Each Qualified Bidder must appear in person or through a duly authorized representative at the Auction. After the announcement of the Initial Auction Bid, the Debtor will request additional bidding at the Auction.

d.  A Qualified Bidder may increase its bid as many times as it chooses, provided that each subsequent bid must exceed the prior bid for the Acquired Assets by at least $100,000.  Such increase may take the form of an all cash bid, the assumption of debt, or a combination of both.

e.  Notwithstanding the foregoing, the Stalking Horse Bidder, in lieu of exceeding the prior bid, may also match any competing bid for the Acquired Assets, and the Debtor will deem the Stalking Horse Bidder's matching bid the highest or best offer based on the Break-Up Fee that otherwise would be paid to the Stalking Horse Bidder.

f.  The Auction shall continue until the Buyer has been determined by the Debtor. The Buyer shall be the bidder making the highest or best bid at the Auction for the Acquired Assets, to be determined in the sole but reasonable discretion of the Debtor, in consultation with the Bid Notice Parties.

g.  No bidder shall be deemed the Buyer without the prior approval of the DIP Lenders.

In consultation with the Bid Notice Parties, the Debtor reserves the right prior to, during and after the Auction (subject to review by the Bankruptcy Court at the Sale Hearing and consultation with the DIP Lenders), to reject any bid that is not in conformity with these Bid Procedures, the orders of the Bankruptcy Court, or the Bankruptcy Code, or in the best interests of the Debtor and its estate, as determined by the Debtor.

14.    Back–Up Bidder. As a condition to qualifying to participate in the Auction, each Qualified Bidder shall be deemed to have consented to serve as a "Back-Up Bidder."  If an

Auction is conducted, the party with the next highest bid after the Buyer at the Auction shall be required to serve as the Back-Up Bidder, and such bid is to remain open for acceptance by the Debtor and consummation by the parties up to and including ten (10) business days following the Outside Date specified in the APA; provided, however, that nothing herein shall be deemed to modify or otherwise alter any provision in the APA, or any rights of termination set forth in sections 9.1.1 and 9.1.2 of the APA.

15.    Selection of Buyer.  The concluding date and time of the Auction shall be stated on the record.  At the conclusion of the Auction, or as soon thereafter as practicable, the Debtor, in consultation with its advisors and the DIP Lenders, will: (i) review each Qualified Bid, and consider each Qualified Bid, on the basis, without limitation, of the amount of the purchase price, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each bidder, and the net benefit to the Debtor's estate, (ii) identify the highest or best offer submitted for the Acquired Assets received at the Auction (the "Prevailing Bid"), (iii) designate the party that submitted the Prevailing Bid as the Buyer, and (iv) identify the Back-Up Bidder.

16.    Results of Auction. Prior to the Sale Hearing, the Debtor will file a notice indicating whether an Auction was held and, if so, summarizing the Auction and identifying the Buyer. At the Sale Hearing, the Court, pursuant to Bankruptcy Code sections 363 and 365, will consider (i) whether to approve the sale of the Acquired Assets to the Buyer (ii) whether to approve the assumption and assignment of Contracts and Leases to the Buyer, and (iii) any objections by parties with standing to the entry of an order providing such relief.

17.    Return of Good Faith Deposits.  Except as otherwise provided herein, all Good Faith Deposits shall be returned to each bidder not selected by the Debtor in accordance with the above procedures as the Buyer or the Back-Up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtor until ten (10) business days after the Outside Date.

18.    Reservation of Rights; Deadline Extension.  Notwithstanding any of the foregoing, the Debtor reserves its rights, in the exercise of its fiduciary obligations, and after consultation with the DIP Lenders, to modify the Bid Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Acquired Assets or otherwise modify the APA, including, without limitation, extending the deadlines set forth in these Bid Procedures, modifying bidding increments, adjourning the Auction and/or adjourning the Sale Hearing in open court without further notice, withdrawing from the Auction the Acquired Assets at any time prior to or during the Auction or canceling the Auction, and rejecting any and all Qualified Bids.

# EXHIBIT "2"

BRIAN L. DAVIDOFF (SBN 102654)
BDavidoff@GreenbergGlusker.com
C. JOHN M. MELISSINOS (SBN 149224)
JMelissinos@GreenbergGlusker.com
COURTNEY E. POZMANTIER (SBN 242013)
CPozmantier@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687

Proposed General Bankruptcy Attorneys for
Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>RHYTHM AND HUES, INC.,<br><br>      Debtor and Debtor in  Possession. | Case No. 2:13-bk-13775-NB<br><br>Chapter 11<br><br>**NOTICE OF DEBTOR'S (1) MOTION TO SELL ASSETS PURSUANT TO ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, AND TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (2) HEARING THEREON; AND (3) OPPORTUNITY TO OVERBID FOR ASSETS** |

**PLEASE TAKE NOTICE** that on March [19], 2013 at __:_0 p.m. (Pacific time), a hearing (the "Sale Hearing") will be held before the Honorable Neil W. Bason, United States Bankruptcy Judge, in Courtroom 1545 in the Royal Federal Building and Courthouse, at 255 E. Temple Street, Los Angeles, CA 90012, on the Debtor's Motion for Orders: (*1) Approving Sale Of Debtor's Assets Under Asset Purchase Agreement Free and Clear Of Liens, Claims And Interests, (2) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts, [and Other Relief]* (the "Motion")[1] [Docket No. __] which has been filed by Rhythm & Hues, Inc., debtor and debtor in possession (the "Debtor").

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

**PLEASE TAKE FURTHER NOTIC**E that copies of the Motion and the declarations filed in support thereof may be obtained by accessing PACER through the United States Bankruptcy Court website for the Central District of California at www.cacb.uscourts.gov, or by contacting the Debtor's proposed general by accessing PACER through the United States Bankruptcy Court website for the Central District of California at www.cacb.uscourts.gov, from the website maintained by the Debtor's proposed claims and noticing agent at http://www.omnimgt.com/Rhythmhues, or by contacting the Debtor's proposed general bankruptcy attorneys, Greenberg Glusker Fields Claman & Machtinger LLP, Attn:  Kaitlin L. Woodson, Paralegal, by telephone at (310) 553-3610, facsimile at (310) 0687, or email at kwoodson@greenbergglusker.com.

**PLEASE TAKE FURTHER NOTICE** that the Motion requests that the Court enter orders pursuant to, inter alia, sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 1010 et seq. (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule ("LR") 6004:

1. Approving the sale of substantial assets of the Debtor, free and clear of all liens, claims and interests pursuant to that certain asset purchase agreement attached as Exhibit 4 to the Motion (the "APA") or pursuant to the modified form of asset purchase agreement (the "Alternative APA") negotiated with the prevailing bidder for the Debtor's assets (the "Buyer");

2. Approving the assumption and assignment of executory contracts and unexpired leases of the Debtor pursuant to the APA (or the Alternative APA), determining that there are no defaults under such contracts and leases other than the payment of certain cure amounts proposed by the Debtor ("Cure Amounts"), if any, and determining that the Buyer has provided adequate assurance of future performance under such contracts and leases;

3. Approving the APA (or the Alternative APA), and all of the transactions contemplated thereby.

4. Finding that the Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code 363(m);

5. Provided that all of the foregoing relief shall be effective immediately upon entry of the applicable order granting such relief, and that any stay of such order under Bankruptcy Rules 6004(h) and 6004(d) is waived and shall not be applicable; and

6. Granting such other and further relief as the Court deems just and appropriate under the circumstances.

**PLEASE TAKE FURTHER NOTICE** that the Motion is supported by the memorandum of points and authorities annexed thereto, the Declarations of Peter Fishman and John Patrick Hughes annexed thereto, ),  the *Declaration of John Patrick Hughes in Support of First Day Motions* [Docket No. 9] (the "Hughes First Day Declaration"), *Declaration of John F. Hedge in Support of First Day Motions* [Docket No. 8] (the "Hedge First Day Declaration"), any oral or documentary evidence presented at or prior to the hearings on the Motion, and the arguments and representations of counsel made at the hearings on the Motion.

**PLEASE TAKE FURTHER NOTICE** that by Order of the Court, the deadline to file and complete service on the Debtor of any opposition to the Motion, other than objections regarding the Buyer's ability to provide adequate assurance of future performance, is March [15], 2013.  The opposition must set forth all relevant facts and any relevant legal authority.  An opposition must be support by affidavits or declarations that conform to the provisions of Local Bankruptcy Rule 9014(f).

**PLEASE TAKE FURTHER NOTICE** that the APA is attached as Exhibit 4 to the Motion.  The assets subject to sale pursuant to the APA (each as more specifically described and/or limited in the APA or the

- 2 -

schedules thereto "Acquired Assets") principally comprise: (a) substantially all of the personal property, tangible and intangible, owned by the Debtor, that is used in the operation of the Debtor's business; (b) permits; (c) certain executory contracts and unexpired personal property leases of the Debtor to be specified by the Buyer; (d) certain administrative assets, (e) certain intellectual property; and (f) the equity securities held by the Debtor in certain of its subsidiaries.

**PLEASE TAKE FURTHER NOTICE** that the base purchase price proposed in the APA, which is subject to further negotiation with potential purchasers and overbid at the auction, is comprised of: (i) cash, payable at the closing of the sale to the Debtor's bankruptcy estate in an amount at least sufficient to ensure that the Debtor's estate will not be administratively insolvent; (ii) either (x) assumption of the post-petition amounts funded under the DIP Loan prior to the date of the closing of the sale, in an amount of up to $17,086,000, plus up to $500,000 for the fees of the DIP Lenders (the "DIP Loan Obligations"), in the form of a replacement loan or exit facility with a maturity date of December 31, 2015 and substantially similar terms and conditions as the DIP Loan or (y) payment in full in cash of the DIP Loan Obligations at the closing of the sale; (iii) assumption of certain other liabilities described in section 2.1 of the APA (together with the DIP Loan Obligations, the "Assumed Liabilities"); and (iv) payment of the Cure Amounts in respect of the executory contracts and unexpired leases to be assumed and assigned in connection with the sale.

**PLEASE TAKE FURTHER NOTICE** that the parties have the opportunity to present competing bids for the Acquired Assets.  Attached hereto as Exhibit 1 are certain "Bid Procedures" approved by Order of the Court, setting forth dates, deadlines and procedures for due diligence, the submission of competing bids, the conduct of an auction and related matters. As set forth in Exhibit 1, the deadline for submission of bids is March 12, 2013, and the Auction is scheduled for March 19, 2013.

DATED: March [__], 2013                              GREENBERG GLUSKER FIELDS CLAMAN &
                                                     MACHTINGER LLP


                                                     By:*/s/ Courtney E. Pozmantier*
                                                         COURTNEY E. POZMANTIER
                                                         Proposed General Bankruptcy Attorneys for
                                                         Debtor and Debtor in Possession

- 3 -

# EXHIBIT "3"

1  BRIAN L. DAVIDOFF (SBN 102654)
   BDavidoff@GreenbergGlusker.com
2  C. JOHN M. MELISSINOS (SBN 149224)
   JMelissinos@GreenbergGlusker.com
3  COURTNEY E. POZMANTIER (SBN 242013)
   CPozmantier@GreenbergGlusker.com
4  GREENBERG GLUSKER FIELDS CLAMAN
   & MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
6  Telephone:  310.553.3610
   Fax:  310.553.0687
7
   Proposed General Bankruptcy Attorneys for
8  Debtor and Debtor in Possession

9

10              UNITED STATES BANKRUPTCY COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                  LOS ANGELES DIVISION

13

14  In re:                              Case No. 2:13-bk-13775-NB

15  RHYTHM AND HUES, INC.,              Chapter 11

16       Debtor and Debtor in Possession.   **NOTICE OF EXECUTORY CONTRACTS
                                        AND UNEXPIRED LEASES SUBJECT TO
17                                      ASSUMPTION AND ASSIGNMENT
                                        PURSUANT TO PENDING SALE
18                                      MOTION; PROPOSED CURE AMOUNTS
                                        WITH RESPECT THERETO; HEARING
19                                      AND DEADLINE FOR OBJECTIONS;
                                        AND RELATED MATTERS**

20                                      Objection Deadline
                                        March __, 2013
21
                                        Hearing
22                                      Date:  March __, 2012
                                        Time:  __:_0 _:m
23                                      Place:  Courtroom 1545
                                               255 E. Temple Street
24                                             Los Angeles, CA 90012

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, ALL PARTIES IN INTEREST HEREIN, AND THEIR RESPECTIVE COUNSEL:**

**PLEASE TAKE NOTICE** that on March [19], 2013 at __:_0 _.m. (Pacific time), a hearing (the "Sale Hearing") will be held before the Honorable Neil W. Bason, United States Bankruptcy Judge, in Courtroom 1545, in the Roybal Federal Building, and Courthouse at 255 East Temple Street, Los Angeles, CA, 90012 on the *Debtor's Motion For Orders: (1) Approving Sale Of Debtor's Assets Under Asset Purchase Agreement Free And Clear Of Liens, Claims And Interests, (2) Approving Assumption And Assignment Of Unexpired Leases And Executory Contracts, [and Other Relief]* (the "Motion") [Docket No. __], which has been filed by Rhythm And Hues, Inc., debtor and debtor in possession (the "Debtor").  If you have received this Notice, you also should have received a copy of the Motion, the supporting declarations, and notice of the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that among other relief, the Motion requests entry of an Order pursuant to Bankruptcy Code section 365: (1) approving the assumption and assignment of executory contracts and unexpired leases of the Debtor pursuant to that certain asset purchase agreement attached as Exhibit 4 to the Motion, (2) determining there are no defaults under such contracts and leases other than the payment of certain amounts required by Bankruptcy Code section 365(b)(1) (the "Cure Amounts") proposed by the Debtor, if any, and (3) determining, at the Sale Hearing, that the Buyer has demonstrated adequate assurance of future performance under such contracts and leases.

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit A hereto is a schedule listing the executory contracts and unexpired leases of the Debtor that may potentially be assumed and assigned pursuant to the Motion, to the Buyer at the Auction.  PARTIES RECEIVING THIS NOTICE SHOULD CAREFULLY REVIEW WHETHER THEIR NAMES AND CONTRACTS OR LEASES ARE LISTED ON THE ATTACHED SCHEDULE OF CONTRACTS AND LEASES THAT MAY BE ASSUMED AND ASSIGNED PURSUANT TO THE MOTION.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   **PLEASE TAKE FURTHER NOTICE** that the Schedule of Contracts and Leases: (i)

2   lists the name of each non-debtor party to the Contracts and Leases, and (ii) specifies the Cure

3   Amount, if any, that the Debtor proposes to pay to cure any and all defaults under each of the

4   Contracts and Leases in the event it is assumed and assigned pursuant to the Motion.

5   **PLEASE TAKE FURTHER NOTICE** that as soon as practicable after the conclusion of

6   the Auction, the Debtor will file with the Court and post on the Debtor's restructuring website

7   http://www.omnimgt.com/Rhythmhues a notice identifying the Buyer and stating which contracts

8   and leases will be assumed and assigned (the "Transferred Contracts List").  The Transferred

9   Contracts List will also be served via first-class mail on all non-Debtor counterparties to the

10  contracts and leases set forth on the Transferred Contracts List within three (3) business days of

11  entry of the Sale Order, together with a copy of the Sale Order.

12  **PLEASE TAKE FURTHER NOTICE** that the Debtor will request at the Sale Hearing a

13  determination, under Bankruptcy Code section 365, that payment of the Cure Amount, if any,

14  listed for each of the Contracts and Leases on the attached Exhibit A will cure any and all defaults

15  thereunder as a prerequisite to assumption and assignment of those Contracts and Leases that the

16  Buyer has designated for assignment.  The Debtor believes that there are no defaults under the

17  Contracts and Leases listed on Exhibit A, and that there are no amounts that need to be paid in

18  order to cure the Contracts and Leases listed thereon, other than payment of the amounts listed on

19  Exhibit A, if any.  If any party is aware of any defaults or other unpaid obligations under any of

20  the Contracts and Leases, or any facts or circumstances indicating that the Court should not grant

21  the relief specified in the first sentence of this paragraph, then such party must file a written

22  response and evidence substantiating such facts or circumstances, as directed in the following

23  paragraph, or forever be barred from asserting any such claim or challenging any such finding.

24  The Debtor intends to rely on the absence of any such response and proceed with the

25  contemplated transactions in reliance thereon.

26  **PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order,

27  March [15], 2013 is the deadline to file and complete service on the Debtor of any opposition to

28  the Motion, including any opposition to the assumption and assignment of any of the Contracts

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    and Leases, and the proposed Cure Amount.  The opposition must set forth all relevant facts and

2    any relevant legal authority.  An opposition must be supported by affidavits or declarations that

3    conform to the provisions of Local Bankruptcy Rule 9014(f).

4         **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and the supporting

5    declarations may be obtained by accessing PACER through the United States Bankruptcy Court

6    website for the Central District of California at www.cacb.uscourts.gov, from the website

7    maintained by the Debtor's proposed claims and noticing agent at

8    http://www.omnimgt.com/Rhythmhues, or by contacting the Debtor's proposed general

9    bankruptcy attorneys, Greenberg Glusker Fields Claman & Machtinger LLP, Attn:  Kaitlin L.

10   Woodson, Paralegal, by telephone at (310) 553-3610, facsimile at (310) 553-0687, or email at

11   kwoodson@greenbergglusker.com.

12

13   DATED:  March __, 2013                    GREENBERG GLUSKER FIELDS CLAMAN
                                              & MACHTINGER LLP

14

15                                           By: */s/ Courtney E. Pozmantier*
                                              COURTNEY E. POZMANTIER
16                                            Proposed General Bankruptcy Attorneys for
                                              Debtor and Debtor in Possession
17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# EXHIBIT "4"

**ASSET SALE AND PURCHASE AGREEMENT**

**BETWEEN**

**RHYTHM AND HUES, INC.,**

**AS SELLER,**

**AND**

**[_____]**

**Dated as of March __, 2013**

# TABLE OF CONTENTS

**Page**

1.    CONVEYANCE OF THE ACQUIRED ASSETS: ........................................................ 1

    1.1    Acquired Assets Transaction.. ................................................................. 1

2.    ASSUMPTION OF LIABILITIES: ..................................................................... 4

    2.1    Assumed Liabilities ................................................................................ 4

    2.2    No Expansion of Third Party Rights.......................................................... 5

    2.3    Retained Liabilities ................................................................................ 5

3.    CERTAIN EMPLOYEE MATTERS. ................................................................... 5

    3.1    Employees. ............................................................................................ 5

    3.2    Cooperation. .......................................................................................... 6

    3.3    No Third Party Rights. ............................................................................ 6

4.    PURCHASE PRICE: ....................................................................................... 6

    4.1    Purchase Price; Deposit Amount ............................................................. 6

    4.2    Allocation of Purchase Price .................................................................... 7

5.    REPRESENTATIONS AND WARRANTIES: ....................................................... 7

    5.1    Representations and Warranties of Seller ................................................. 7

    5.2    Representations and Warranties of Purchaser........................................... 8

    5.3    As-Is Transaction; Inspection. ............................................................... 10

    5.4    Survival of Representations, Warranties and Covenants of Purchaser. ...... 10

6.    CONDITIONS TO CLOSING: ........................................................................ 11

    6.1    Conditions to Obligations of Seller and Purchaser .................................. 11

    6.2    Conditions to Obligations of Purchaser .................................................. 11

    6.3    Conditions to Obligations of Seller ....................................................... 12

7.    CLOSING: .................................................................................................. 12

    7.1    The Closing .......................................................................................... 12

    7.2    Ancillary Agreements ........................................................................... 12

    7.3    Seller's Deliveries ................................................................................ 13

    7.4    Purchaser's Deliveries .......................................................................... 13

8.    CERTAIN ADDITIONAL COVENANTS: .......................................................... 13

    8.1    Bankruptcy Actions .............................................................................. 13

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 8.2 | Registrations, Filings and Consents; Further Actions | 14 |
| 8.3 | Assumed Contracts; Cure Amounts | 14 |
| 8.4 | Post-Closing Covenants | 14 |
| 8.5 | Certain Transactions | 15 |
| 8.6 | Communications with Customers and Suppliers | 16 |
| 8.7 | Further Assurances | 16 |
| 9. | TERMINATION: | 16 |
| 9.1 | Termination by the Parties | 16 |
| 9.2 | Notice of Termination | 17 |
| 9.3 | Procedure and Effect of Termination; Break-Up Fee. | 17 |
| 10. | OTHER TAX MATTERS: | 18 |
| 10.1 | Tax Returns for Pre-Closing Period | 18 |
| 10.2 | Tax Returns for Post-Closing Period | 18 |
| 10.3 | Straddle Period | 18 |
| 10.4 | Cooperation | 19 |
| 10.5 | Tax Elections | 19 |
| 11. | MISCELLANEOUS: | 19 |
| 11.1 | Bulk Sales Laws | 19 |
| 11.2 | Notices | 19 |
| 11.3 | Assignment | 20 |
| 11.4 | Entire Agreement | 20 |
| 11.5 | Waiver | 20 |
| 11.6 | Severability | 20 |
| 11.7 | Amendment | 20 |
| 11.8 | Expenses | 20 |
| 11.9 | Third Parties | 20 |
| 11.10 | Headings | 21 |
| 11.11 | Counterparts | 21 |
| 11.12 | Governing Law | 21 |
| 11.13 | Public Announcements | 21 |

## TABLE OF CONTENTS

(continued)

**Page**

11.14  Sales or Transfer Taxes.......................................................................... 21

11.15  Venue and Retention of Jurisdiction..................................................... 21

11.16  Risk of Loss ............................................................................................. 21

11.17  Enforcement of Agreement..................................................................... 21

11.18  No Right of Setoff................................................................................... 21

11.19  Limitation on Damages........................................................................... 22

## ASSET SALE AND PURCHASE AGREEMENT

**THIS ASSET SALE AND PURCHASE AGREEMENT** (this "**Agreement**") dated as of March __, 2013, is entered into by and between [_____], a _____ _____ ("**Purchaser**") and **Rhythm and Hues, Inc.**, a California corporation ("**Seller**").  Certain capitalized terms in this Agreement are defined on Schedule A.

## RECITALS

A.      Seller is engaged in the Business.

B.      On January __, 2013, Seller filed a voluntary petition (the "**Bankruptcy Case**") for relief under Chapter 11 of Title 11, U.S.C. §§101 *et seq.* (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, (the "**Bankruptcy Court**"), case number [2:13-bk-13775-NB].

C.      On February 13, 2013, Seller and the lenders from time to time party thereto (each, a "**Lender**", and, collectively, the "**Lenders**"), entered into that certain Senior Secured Super-Priority Debtor in Possession Loan Agreement, dated as of February __, 2013, by and among the Seller and each Lender party thereto (as may be modified from time to time, the "**DIP Loan Agreement**"), pursuant to which, among other things, the Lenders agreed to loan to Seller an amount of up to $17,086,000  subject to Bankruptcy Court approval (the "**DIP Loan**").

D.      On _____ __, 2013, the Bankruptcy Court entered an order (I) approving bidding procedures for the sale of certain assets of Seller, (II) approving the form and manner of notice, (III) scheduling an auction and sale hearing, and (IV) approving procedures for determining cure amounts (the "**Bid Procedures Order**").

E.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller desires to sell to Purchaser all right, title and interest of Seller in and to the Acquired Assets and Purchaser desires to make such purchase free and clear of all Liens except as set forth herein, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

**1.      CONVEYANCE OF THE ACQUIRED ASSETS:**

**1.1      Acquired Assets Transaction**.  Upon the terms and subject to the conditions set forth in this Agreement, at Closing Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from Seller, free and clear of all Liens, except Liens included in the Assumed Liabilities assumed by Purchaser pursuant to

Article 2, if any, all of the assets and properties described in Section 1.1.1 below (collectively, the "**Acquired Assets**"), subject in each case to Section 1.1.2.

       **1.1.1    Acquired Assets**.  The Acquired Assets consist solely of all of Seller's right, title and interest in and to the (other than the Excluded Assets), the following:

       **A.**      Personal Property;

       **B.**      Permits;

       **C.**      Transferred Contracts;

       **D.**      Administrative Assets;

       **E.**      Purchased Intellectual Property;

       **F.**      All equity securities held by Seller in the Acquired Subsidiaries;

       **G.**      All goodwill of the Seller relating to the Business.

in each case if such assets are used primarily to support the Business, including, without limitation, all of Seller's rights in the assets identified on SCHEDULE 1.1.1.

       **1.1.2    Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

       **A.**      [**Bailed Assets**.  Any machinery, equipment, tools and Inventory owned by any other third party listed in SCHEDULE 1.1.2.A ("**Third Party Bailed Assets**").]

       **B.**      **Personnel and Medical Records**.  All work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws: Purchaser will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with Purchaser in connection with the sale hereunder, with the prior written consent, to the extent required, of such employee or after posted written notice or other appropriate notice to such employees if legally required.  If an employee objects to provision of personnel or medical records to Purchaser, the records will not be provided.

       **C.**      **Certain Financial Assets**.  Cash, cash equivalents, bank accounts and all accounts receivable.

       **D.**      **Tax Refunds**.  Any refund of Taxes paid, or claim for refund of Taxes paid, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

**E.    Privileged Information and Materials**.    Information and materials protected by the attorney-client privilege or that Seller considers to be proprietary, and the lack of which excluded information and material are not material to the operation of the business provided that such information and material is listed on <u>SCHEDULE 1.1.2.E</u> hereto.

**F.    Insurance**.    The benefit of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the Business (including any right to proceeds thereunder).

**G.    Certain Rights**.    All of the rights and claims of Seller available to Seller (i) under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing and (ii) relating to any litigation or other proceeding, whether in process, contemplated or otherwise, to the extent relating to facts, circumstances or matters that existed prior to the Closing Date, including any and all proceeds of the foregoing all Third Party Rights.

**H.    Other Excluded Assets**.    All other assets listed on <u>SCHEDULE 1.1.2.H</u>.

**1.1.3    Post-Closing Asset Deliveries**.    Should Seller or Purchaser, in their reasonable discretion, determine after the Closing that books, records or other similar materials constituting Acquired Assets are still in the possession of Seller, Seller shall promptly deliver them to Purchaser.    Should Seller or Purchaser, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to Seller at no cost to Seller.

**1.1.4    Pro-rations:**

**A.**    To the extent that Seller has made any payment relating to the Business prior to the Closing Date with respect to any item listed in Subparagraph B below relating to periods on or following the Closing Date, Purchaser shall reimburse Seller on a per diem basis; and

**B.**    To the extent Purchaser makes any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, Seller shall reimburse Purchaser on a per diem basis, in each case for the following:

**(i)**    Rent for the Premises, storage space and copier leases and other pre-paid amounts under Transferred Contracts (such other prepaids to be mutually agreed by the parties before Closing);

**(ii)**    Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

3

**(iii)**    Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business; and

**(iv)**    Electric, fuel, gas, telephone and internet services and other utility charges.

**C.    Further Assurance**.  The parties will use commercially reasonable efforts to determine the amounts of the above pro-rations and settle such amounts at Closing.  To the extent that, within 60 days after Closing, Seller, on the one hand, or Purchaser, on the other hand, receive any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, Seller or Purchaser shall, as soon as practicable but no later than 90 days after Closing, send any such bill or invoice to the other Party.  If necessary to avoid incurring interest, penalties and/or late charges, Purchaser may pay all amounts shown to be due thereon, and may invoice Seller for all amounts owed by Seller thereunder, and in such case Seller shall reimburse such amounts.

Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within 45 days after the end of a month in which a bill or invoice is sent to a Party (or Affiliate thereof); provided, however, that the disputed portion of any such item shall be paid within 45 days after the final determination thereof on an item-by-item basis.  When Purchaser makes a payment to a third party which is required to be reimbursed to Purchaser by Seller, the reimbursement payment shall be considered the repayment of an advance.

## 2.    ASSUMPTION OF LIABILITIES:

**2.1    Assumed Liabilities**.  At and as of the Closing, Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all obligations, liabilities and responsibilities referred to in this Section 2.1 ("**Assumed Liabilities**"), as follows:

**2.1.1**    The obligations of Seller to be performed under the Contracts listed on SCHEDULE 2.1.1 (the "**Transferred Contracts**"), including the Cure Amounts for such Transferred Contracts set forth therein; and the obligations of Seller to be performed under licenses and Permits included in the Acquired Assets that are assigned or otherwise transferred to Purchaser pursuant to this Agreement and listed on SCHEDULE 2.1.1.

**2.1.2**    Obligations described in Article 3 of this Agreement with respect to employees.

**2.1.3**    The obligations to pay for assets, goods or services ordered by Seller on or prior to the Closing and that are received by the Purchaser after Closing.

**2.1.4**    Liabilities and obligations arising out of, resulting from, or relating to sales pursuant to Acquired Assets of products or services by the Business, including without limitation all ongoing projects and deliverables thereunder.

**2.1.5**    The DIP Loan Obligations.

4

**2.2    No Expansion of Third Party Rights**.  The assumption by Purchaser of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against Purchaser or Seller as compared to the rights and remedies that such third party would have had against Seller absent the Bankruptcy Case, had Purchaser not assumed such Assumed Liabilities. Without limiting the generality of the preceding sentence, the assumption by Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

**2.3    Retained Liabilities**.  Purchaser shall not assume or be deemed to have assumed, and shall have no liability or obligation with respect thereto, any other liabilities of the Company (collectively, "**Retained Liabilities**") including without limitation the following:  (a) except as set forth in Section 3 below, liabilities in respect of employment or services performed on or prior to the Closing Date; (b) existing litigation for which a claim has been made to or threatened in writing against Seller on or before the Closing Date; (c) all Tax liabilities of Seller for all periods (but excluding any Tax liabilities allocated to Purchaser pursuant to Section 10.3 of this Agreement); (d) any liability or obligation of Seller for administrative fees and expenses, including, without limitation, any claims arising under Section 503(b) of the Bankruptcy Code; (e) any liability or obligation of Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement; (f) all Claims, except for Assumed Liabilities; and (g) any liability or obligation not expressly assumed pursuant to Section 2.1 hereof.

**3.    CERTAIN EMPLOYEE MATTERS.**

**3.1    Employees**.

**3.1.1**    Listed on SCHEDULE 3.1.1 are those employees and consultants of Seller that as of [_____ __], 2013, performed services exclusively for the Business, and with respect to each such employee the Purchaser will offer employment with such new employment to commence (if accepted) with effect from the Closing Date and will confirm the list of such employees to Seller no later than the Closing Date.  Such employment will be on terms and conditions such that Seller will not incur any liability under the WARN Act by reason of the consummation of the transactions contemplated herein or any action taken by Purchaser on or after the Closing Date.

**3.1.2**    Purchaser's offer of employment described in Section 3.1.1 shall give each such employee credit for time previously employed by Seller. Employees that accept and commence employment with Purchaser pursuant to a written offer letter with Purchaser shall be referred to herein as a "**Transferred Employee**" or "**Transferred Employees.**"  All unused paid time off and leave of absence with respect to such Transferred Employees shall be transferred and assumed by Purchaser, and shall be considered as part of the Assumed Liabilities.

**3.1.3**    Purchaser shall assume all obligations and liabilities related to employees of Seller as of the Closing for (a) accrued, unpaid and unused vacation, sick leave, holiday entitlements, seniority rights and other entitlements to paid and unpaid time off and all earned and accrued salary and wages of the employees of Seller at Closing which remain unpaid and

5

unused as of the Closing Date, and (b) WARN Act liability, if any, relating to any pre Closing liability of Seller.  All of the foregoing shall be considered as part of the Assumed Liabilities.

**3.2    Cooperation**.  Seller and Purchaser will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

**3.3    No Third Party Rights**.  No provision of this Agreement confers rights or remedies upon any person, including Transferred Employees, other than the Parties.

## 4.    PURCHASE PRICE:

**4.1    Purchase Price; Deposit Amount**.  Subject to the terms and conditions of this Agreement, in consideration of the Sale, the purchase price for the Acquired Assets shall be the amount of:

**(a)**    cash in immediately available funds at the Closing in the amount of $_____;

**(b)**    assumption of the Assumed Liabilities; and

**(c)**    payment of Administrative Expenses.

The final aggregate purchase price, as so determined, is referred to herein as the "**Purchase Price**".

**4.1.1    Deposit Amount**.  Upon execution of this Agreement, Purchaser shall deposit with Seller, in a segregated, lien-free non-interest bearing account, $[_____] in immediately available funds (such amount, the "**Deposit Amount**"), to be released in accordance with the following procedures:

**A.**    If the Closing occurs, the Deposit Amount shall be applied towards the Purchase Price.

**B.**    Upon any termination pursuant to Section 9.1.2, the Deposit Amount shall be retained by Seller.

**C.**    If Seller enters into an agreement with a Buyer (as defined in the Bid Procedures Order) other than Purchaser, the deposit amount will be delivered to Purchaser in accordance with the provisions set forth in Section 9.3.2 along with the Break-Up Fee, if applicable.

**D.**    Upon termination of this Agreement for any other reason, Seller shall deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Purchaser, to be retained by Purchaser.

**4.1.2    Delivery of Purchase Price**.  At the Closing, Purchaser shall pay to Seller, an aggregate amount equal to items (a) and (c) of the Purchase Price, as described above,

less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.2) by wire transfer in immediately available funds to an account specified by Seller.

    **4.2**    **Allocation of Purchase Price**.  The Parties agree to allocate the Purchase Price among the Business and the agreements provided herein for transfer of the Business to Purchaser, for all purposes (including financial, accounting and tax) (the "**Allocation**") in a manner consistent with the Allocation Schedule set forth in <u>SCHEDULE 4.2</u> to be mutually agreed upon by Purchaser and Seller in accordance with Section 1060 of the Internal Revenue Code based on the fair market value of the Acquired Assets.  Purchaser shall provide to Seller a draft Allocation within 15 days following the Closing Date.  This Allocation shall become final and binding on the parties, unless Seller notifies Purchaser within 15 days after receipt of such Allocation of Seller's disagreement with such Allocation.  In the event Seller timely notifies Purchaser of such disagreement, the parties shall resolve such disagreement in the manner described in Section 11.18 of this Agreement.  Purchaser and Seller shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.  Seller shall provide Purchaser and Purchaser shall provide Seller with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

**5.**    **REPRESENTATIONS AND WARRANTIES:**

    **5.1**    **Representations and Warranties of Seller**.  With the express understanding that the following representations and warranties shall have no effect following, and shall not survive, the Closing, Seller hereby represents and warrants as follows:

    **5.1.1**    **Organization and Good Standing**.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of California and qualified to do business as foreign corporations in the states where qualification is necessary, except where the failure so to qualify or to be so licensed would not have a Material Adverse Effect, and has all requisite corporate power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted.

    **5.1.2**    **Corporate Power; Due Authorization**.  Seller has the corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, subject to Bankruptcy Court approval, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by Seller and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of Seller.  Subject to the entry and effectiveness of the Sale Approval Order, this Agreement and the Ancillary Agreements have been duly and validly executed and delivered by or on behalf of Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser) each such agreement constitutes a legal, valid and binding agreement of Seller,

enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

5.1.3 **As-Is Transaction**. Seller hereby sells, assigns, transfers and conveys the Acquired Assets to Purchaser "as is", "where is" and "with all faults", with no representations or warranties or recourse against the Seller as to their physical condition, merchantability, fitness for any particular purpose, use or value, the income to be derived therefrom or expenses to be incurred in connection therewith. IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS, BUT INSTEAD HEREBY EXPRESSLY DISCLAIMS ANY AND ALL EXPRESSED OR IMPLIED WARRANTIES CONCERNING THE CONDITION OF THE ACQUIRED ASSETS AND ANY PORTIONS THEREOF, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

5.2 **Representations and Warranties of Purchaser**. Purchaser warrants and represents to Seller as follows:

5.2.1 **Corporate Data**. Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

5.2.2 **Corporate Power; Due Authorization**. Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser. This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of Seller), valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

5.2.3 **No Violations**. Neither the execution, delivery nor performance of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated herein, nor compliance by Purchaser with any of the provisions hereof, will: (a) require Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (b) conflict with or result in any breach of any provisions of the certificate of incorporation, bylaws or other organizational document of Purchaser; or (c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Purchaser's properties or assets.

8

**5.2.4    Litigation**.  Except for the pendency of the Bankruptcy Case, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.5    Brokers**.  Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

**5.2.6    Solvency**.  Upon the consummation of the transactions contemplated by this Agreement:  (a) Purchaser will not be insolvent; (b) Purchaser will not be left with unreasonably small capital; (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; (d) the capital of Purchaser will not be impaired; and (e) immediately following closing, Purchaser will have sufficient capital to continue the Business as a going concern (it being understood that Purchaser will have no obligation to continue all or any portion of the Business as a going concern).

**5.2.7    Availability of Funds**.  Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the cash portion of the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.[1]

**5.2.8    Adequate Assurance of Future Performance**.  Purchaser has provided, at the time set forth in the Bid Procedures Order, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Seller) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

**5.2.9    Compliance with Law**.  Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.10    Anti-Money Laundering**.  Purchaser is in compliance with:  (a) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (c) the International Emergency Economic Power Act (50 U.S.C. 1701 *et seq*.), and any applicable implementing regulations; (d) the Trading with the Enemies Act (50 U.S.C. 50 *et seq*.), and any applicable implementing regulations; and (e) all applicable legal requirements

---

[1] NOTE: Purchaser will need parent guarantee if SPE is used.

relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business. Neither the Purchaser nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities. Purchaser agrees that should it, or any of its directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the United States Government, Purchaser shall inform Seller in writing immediately.

      **5.3**    **As-Is Transaction; Inspection**.

      **5.3.1**  PURCHASER ACKNOWLEDGES, REPRESENTS, WARRANTS AND AGREES THAT UPON THE CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE ACQUIRED ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE REQUIRED ACQUIRED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."

      **5.3.2**  PURCHASER ACKNOWLEDGES AND REPRESENTS TO SELLER THAT PURCHASER HAS HAD THE OPPORTUNITY TO CONDUCT PRIOR TO THE EFFECTIVE DATE SUCH INSPECTIONS AND INVESTIGATIONS OF THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ACQUIRED ASSETS AND ITS ACQUISITION THEREOF, INCLUDING BUT NOT LIMITED TO THE APPROPRIATENESS OF THE AMOUNT OF THE PURCHASE PRICE PURCHASER IS PAYING HEREIN. PURCHASER FURTHER WARRANTS AND REPRESENTS TO SELLER THAT PURCHASER WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF SELLER, OR ITS AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO. PURCHASER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS, KNOWN AND UNKNOWN, INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS, ADVERSE PHYSICAL OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS, AND THAT SELLER HAS NO OBLIGATION TO REPAIR OR CORRECT ANY SUCH ADVERSE MATTERS, LATENT OR PATENT DEFECTS.

      **5.4**    **Survival of Representations, Warranties and Covenants of Purchaser**. The representations and warranties made by Purchaser in this Agreement, any Ancillary Agreement or any other document delivered to Purchaser hereunder or thereunder shall survive the execution and delivery of this Agreement and the Closing, for a period of eighteen (18) months

after the Closing. The covenants made by Purchaser in this Agreement or any Ancillary Agreement shall survive the Closing.

## 6.    CONDITIONS TO CLOSING:

**6.1    Conditions to Obligations of Seller and Purchaser**.  The respective obligations of each Party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1    Sale Approval Order**.  The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, Seller and Lenders, shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2    No Law, Judgments, etc**.  No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each Party taking any and all steps required by Section 8.2 of this Agreement).

**6.1.3    The Lenders' Consent**.  The Seller shall have obtained the consent of the Lenders as required by Section 2.1(d) of the DIP Loan Agreement.

**6.1.4    Accuracy of Representations and Warranties; Performance of this Agreement**.  Each of the representations and warranties made by Seller shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Ancillary Agreements to be performed or complied with by them on or prior to the Closing.

**6.2    Conditions to Obligations of Purchaser**.   The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

**6.2.1    Accuracy of Representations and Warranties**. Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), other than any inaccuracies that do not, in the aggregate, have a Material Adverse Effect.

**6.2.2    Performance of Covenants**. Each of the Ancillary Agreements to which Seller is a party shall have been executed and delivered by Seller to Purchaser, and all other

agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Seller on or before the Closing shall have been performed in all respects.

**6.2.3   Bill of Sale; Assignment Agreement**.  Seller shall have delivered to Purchaser an executed Assignment and Assumption Agreement referred to in Section 7.2.1 and the Bill of Sale set forth in Section 7.2.2 hereof.

**6.3   Conditions to Obligations of Seller**.  Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

**6.3.1   Accuracy of Representations and Warranties**.  The representations and warranties of Purchaser contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), other than any inaccuracies that do not, in the aggregate, have a material adverse effect on Purchaser.

**6.3.2   Performance of Covenants**.  Each of the Ancillary Agreements to which Purchaser is a party shall have been executed and delivered by Purchaser to Seller, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing shall have been performed in all material respects, and Purchaser shall provide adequate assurance of future performance under the Ancillary Agreements.

**6.3.3   Delivery of Purchase Price**.  Purchaser shall have delivered to Seller the cash portion of the Purchase Price by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Seller to Purchaser on the Closing Date.

**7.   CLOSING:**

**7.1   The Closing**.  Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby shall take place at the offices of Greenberg Glusker Fields Claman & Machtinger LLP, 1900 Avenue of the Stars, 2100, Los Angeles, California 90067 at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree in writing.

**7.2   Ancillary Agreements**.  At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

**7.2.1**   Assignment and Assumption Agreement relating to the Transferred Contracts and all other Assumed Liabilities, consistent with the Sale Approval Order substantially in the form attached hereto as <u>SCHEDULE 7.2.1</u>.

12

**7.2.2**   Bill of Sale substantially in the form attached hereto as <u>SCHEDULE 7.2.2</u>.

**7.3**   **Seller's Deliveries**.   At the Closing, Seller shall deliver to Purchaser the following, in proper form for recording where appropriate:

**7.3.1**   Executed assignments, if applicable, for the Permits and Contracts included in the Acquired Assets.

**7.3.2**   Duly executed Bill of Sale transferring the Acquired Assets to Purchaser.

**7.3.3**   Appropriate receipts.

**7.4**   **Purchaser's Deliveries**.   At the Closing, Purchaser shall deliver to Seller (or such other party designated below), in proper form for recording where appropriate:

**7.4.1**   The cash portion of the Purchase Price less the Deposit Amount as required by, and in accordance with, Section 4.1.

**7.4.2**   An Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.3**   An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4**   To the Lenders, documents pursuant to which the Purchaser Assumes the DIP Loan, including all documents and instruments sufficient to maintain and continue the validity and perfection of all security interests granted to the DIP Loan, all of which shall be in a form acceptable to the Lenders.

## 8.   CERTAIN ADDITIONAL COVENANTS:

**8.1**   **Bankruptcy Actions:**

**8.1.1**   Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Approval Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

**8.1.2**   This Agreement is subject to approval by the Bankruptcy Court.

**8.1.3**   In the event that a Buyer (as defined in the Bid Procedures Order) other than Purchaser is approved by the Bankruptcy Court as the purchaser of the Acquired Assets at the hearing on the Sale, then this Agreement shall not terminate, but rather shall become a "back-up bid", at the option of Seller, which shall remain open for acceptance by Seller, but subject and

subordinate in all respects to the rights of the Buyer, for ten (10) Business Days after the Outside Date.

**8.2    Registrations, Filings and Consents; Further Actions**.  Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

**8.3    Assumed Contracts; Cure Amounts**.  Purchaser shall pay Cure Amounts as agreed to by Purchaser and each party to an Assumed Contract or, absent such agreement, by order of the Bankruptcy Court in the time and manner specified by the Sale Approval Order.

**8.4    Post-Closing Covenants**.  From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

**8.4.1    Books and Records and Litigation Assistance From and After Closing:**

**A.**    Purchaser and its Affiliates shall use reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchaser by Seller and their Affiliates pursuant to the provisions of this Agreement for a period of not less than one year from the Closing Date, or for any longer period as may be required of the Business by any government agency, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense.  If and when Purchaser believes that such records are no longer legally required, it will notify Seller.  During such period, Purchaser shall: (i) provide Seller or their Affiliates with such documents and information as necessary, consistent with past practice, to complete the Seller's accounting books and records; and (ii) make such books and records available to Seller and their Affiliates as may be reasonably required by Seller in connection with the Bankruptcy Case, in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, or the Acquired Assets during such period.  In the event Purchaser wishes to destroy or dispose of such books and records after one year from the Closing Date, it shall first give not less than 30 days' prior written notice to Seller, and Seller shall have the right, at its option, upon prior written notice given to Purchaser within 20 days of receipt of Purchaser's notice, to take possession of said records within 30 days after the date of Purchaser's notice to Seller hereunder.

**B.**    Purchaser, for itself and on behalf of its Affiliates, agrees to:  (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations; (ii) make available documents and records delivered to it by Seller reasonably necessary in connection with any pursuit, contest or defense related to its business or otherwise, including documents that may be considered to be "confidential" or subject to trade secret protection, except that:  (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would

14

cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); and (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and their Affiliates in connection with such claim.

8.4.2  **Payment and Collections**.  Seller shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchaser after Closing, and Purchaser shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Seller after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, Seller or Purchaser, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.  Seller shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Seller with respect to such items.  Purchaser shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Seller shall cooperate with Purchaser as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

8.4.3  **Intellectual Property Transition Rights**.  Seller will have the right, for a period of one year after the Closing, to retain copies of and continue to have access to and use any corporate name and Administrative Assets included in the Acquired Assets and bearing any trademark, service mark, trade name or related corporate name included in the Acquired Assets, but only in connection with the administration of the Bankruptcy Case and the matters contemplated by this Agreement.

8.5  **Certain Transactions**.  Purchaser shall not, and shall cause its Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to:  (a) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by this Agreement or the Ancillary Agreements or the expiration or termination of any applicable waiting period; (b) significantly increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; (c) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (d) materially delay or prevent the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.6**    **Communications with Customers and Suppliers**.    Prior to the Closing and except as permissible under the terms of a binding confidentiality and nondisclosure agreement between Seller and Purchaser, Purchaser has not, and shall cause its Affiliates and representatives not to, contact, engage in any discussions or otherwise communicate with any of the Business' customers, suppliers and others with whom it has material commercial dealings which discussions or communications could reasonably be construed as likely to adversely affect the operations of the Business, without obtaining the prior written consent of Seller (which may be conditioned on Seller having the right to participate in any meetings or discussion with any such customers, suppliers or others); provided, that Purchaser and Seller shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of Purchaser, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition.

**8.7**    **Further Assurances.** Each of Seller and Purchaser shall use commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Outside Date, and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

## 9.    TERMINATION:

**9.1**    **Termination by the Parties**.    Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

### 9.1.1    By Either Party:

**A.**    By mutual written consent of Seller and Purchaser.

**B.**    Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order.

**C.**    Provided the terminating Party is not in default of its obligations under this Agreement, by Seller or Purchaser if the Closing shall not have occurred by March 22, 2013 (the "**Outside Date**").

**D.**    Provided the terminating Party is not in default of its obligations under this Agreement, by Seller or Purchaser, if the Bankruptcy Court has not entered the Sale Approval Order, on or before [_____] (the "**Termination Date**") or such Sale Approval Order is subject to a stay or injunction.

**9.1.2    By Seller**.  By Seller, if (a) any condition to the obligations of Seller set forth in Section 6.1 or Section 6.3 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition or compliance with such agreement is not waived by Seller or (b) there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained

16

in this Agreement, that would result in a failure of a condition set forth in Section 6.1 or Section 6.3, and which breach cannot be cured or has not been cured by the earlier of (i) three (3) Business Days after giving of written notice by Seller to Purchaser of such breach and (ii) the Termination Date.

        **9.1.3   By Purchaser**.  By Purchaser, if (a) any condition to the obligations of Purchaser set forth in Section 6.1 or Section 6.2 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition or compliance with such agreement is not waived by Purchaser, (b) there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement, that would result in a failure of a condition set forth in Section 6.1 or Section 6.2, and which breach cannot be cured or has not been cured by the earlier of (i) three (3) Business Days after giving of written notice by Purchaser to Seller of such breach and (ii) the Termination Date, or (c) the Bankruptcy Court approves an agreement with a Buyer other than the Purchaser, and Purchaser elects to terminate this Agreement, subject to Section 8.1.3.

        **9.2     Notice of Termination**.  In the event of any termination pursuant to Sections 9.1.1, 9.1.2 and 9.1.3, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

        **9.3     Procedure and Effect of Termination; Break-Up Fee**.

        **9.3.1**   In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein no Party shall have any liability or further obligation to any other Party resulting from such termination except for the provisions of:   (a)(i) Purchasers' obligations under any confidentiality agreement between Purchaser and Seller; (ii) Article 9 (Termination); and (iii) Sections 4.1.1 (Deposit Amount), 11.2 (Notices), 11.3 (Assignment), 11.4 (Entire Agreement), 11.5 (Waiver), 11.7 (Amendment), 11.8 (Expenses), 11.12 (Governing Law), 11.13 (Public Announcements), and 11.15 (Venue and Retention of Jurisdiction), all of which shall remain in full force and effect; and (b) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination.  In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

        **9.3.2**   If this Agreement is terminated because the Bankruptcy Court approves an agreement with a Buyer other than the Purchaser, and Purchaser elects to terminate this Agreement, subject to Section 8.1.3, Seller shall pay to Purchaser a break-up fee in an amount equal to one and a half percent (1.5%) of the total Purchase Price, provided that such amount shall not exceed One Hundred Fifty Thousand United States Dollars ($150,000) (the "**Break-Up**

Fee"), which shall be paid by wire transfer of immediately available funds from and out of the proceeds of the purchase price paid for the Acquired Assets within three (3) Business Days of Seller's receipt thereof.

**9.3.3**   The Break-Up Fee shall be the sole and exclusive remedy of Purchaser and its Affiliates for any termination of this Agreement. In no event shall Seller or any of its Affiliates have any liability with respect to Purchaser or any other Person hereunder in excess of the Break-Up Fee in the event that this Agreement terminates for any reason, and any claim, right or cause of action by Purchaser or any other Person against Seller or its Affiliates in excess of the applicable Break-Up Fee is hereby fully waived, released and forever discharged.  The Seller's obligation to pay the Break-Up Fee shall be subject and subordinate to the DIP Loan Obligations in all respects.

## 10.    OTHER TAX MATTERS:

**10.1    Tax Returns for Pre-Closing Period**.   Seller will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds.  Purchaser shall make available to Seller (and to Seller's accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Seller to prepare these Tax Returns.  Seller will make all payments required with respect to any such Tax Return.

**10.2    Tax Returns for Post-Closing Period**.  Purchaser will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Seller will include the operations of the Business).  Purchaser shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the Business pertaining to:  (a) any period ending after the Closing Date; and (b) the portion of any Taxes for which Purchaser is liable as determined in accordance with Section 10.3 below.

**10.3    Straddle Period**.  For purposes of this Article 10 and Section 2.3, whenever it is necessary to allocate the liability for Taxes for a Straddle Period, the determination of the Taxes of the Business for the portion of the Straddle Period ending at the end of the Closing Date (the "**Pre Closing Portion**") and the portion of the Straddle Period beginning after the Closing Date (the "**Post-Closing Portion**") will be determined by assuming that the Straddle Period consisted of two taxable years or periods, one of which ended at the close of business on the Closing Date and the other of which began at the beginning of the day after the Closing Date, and items of income, gain, deduction, loss or credit related to the Acquired Assets and the Business for the Straddle Period will be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books associated with the Business were closed at the end of the Closing Date; provided, however, that all real property taxes, personal property taxes, ad valorem obligations and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets (other than Taxes resulting from the transactions described herein as provided for in Section 10.1) for a Straddle Period shall be apportioned between Seller and Purchaser as of the Closing Date based on the number of days of such taxable period up to and

18

including the Closing Date and the number of days of such taxable period following the Closing Date.  Seller shall be liable for the proportionate amount of such taxes that is attributable to the period up to and including the Closing Date; Purchaser shall be liable for the proportionate amount of such taxes that is attributable to the period following the Closing Date.

**10.4    Cooperation**.  Seller and Purchaser will cooperate in connection with:  (a) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (b) any determination of liability for Taxes; and (c) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets.  Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to Purchaser.

**10.5    Tax Elections**.  Seller shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.

**11.    MISCELLANEOUS:**

**11.1    Bulk Sales Laws**.  Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**11.2    Notices**.  All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile or electronic mail (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to Purchaser at the address set forth on the signature page hereto and to Seller at the address set forth below (or at such other address as the intended recipient shall have specified in a written notice given to the other party hereto):

|  |  |
|---|---|
| If to Seller: | Rhythm and Hues, Inc.<br>2100 East Grand Avenue<br>El Segundo, CA 90245<br>Attn:  [_____]<br>Fax No.:  (___) ___-____ |
| With a copy to: | Greenberg Glusker Fields Claman & Machtinger LLP<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067<br>Attn:  [_____]<br>Fax No.:  (___) ___-____ |
| If to Purchaser: | [_____]<br>[_____]<br>[_____]<br>Attn:  [_____]<br>Fax No.:  (___) ___-____ |

With a copy to:     [_____]
                    [_____]
                    [_____]
                    Attn: [_____]
                    Fax No.: (___) ___-____

**11.3    Assignment**.  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

**11.4    Entire Agreement**.  This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.   This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**11.5    Waiver**.  Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement:  (a) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (b) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (i) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (iii) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

**11.6    Severability**.  Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**11.7    Amendment**.  This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**11.8    Expenses**.  Each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**11.9    Third Parties**.  Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective

permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**11.10  Headings**.   The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**11.11  Counterparts**.  More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**11.12  Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of California and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**11.13  Public Announcements**.  Seller and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**11.14  Sales or Transfer Taxes**.  All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by [_____].

**11.15  Venue and Retention of Jurisdiction**.  All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions; provided that if the Bankruptcy Case is closed then the exclusive jurisdiction for any such action shall be in the state or federal courts of [_____].

**11.16  Risk of Loss**.  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by Seller.

**11.17  Enforcement of Agreement**.  The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**11.18  No Right of Setoff**.  Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**11.19  Limitation on Damages**.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 11, IN NO EVENT SHALL SELLER BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers.

**SELLER**:                                    **PURCHASER**:

**RHYTHM AND HUES, INC.**              Purchaser Name:

By: _____        By: _____
Print Name: _____        Print Name: _____
Title: _____        Title: _____
Address: _____        Address: _____
_____                   _____
                                              Attention: _____
                                              Facsimile: _____

22

## SCHEDULE A

## DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

"**Acquired Subsidiaries**" means Rhythm & Hues Studios Ltd., Rhythm & Hues India Pvt Ltd., Rhythm & Hues Taiwan Co. Ltd. and Rhythm &  Hues Capital Funds Management LLC.

"**Administrative Assets**" means books, records and other administrative assets used exclusively in the operations of the Business including but not limited to advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files.

"**Administrative Expenses**" means all costs and expenses allowable under Section Bankruptcy Code Section 503.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity, and all officers, directors, managers of such entity, and shareholders and members of such entity who own more than 10% of such entity.  For purposes of this definition, control means ownership of more than 50% of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Sale and Purchase Agreement, including its Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.2.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means those Transferred Contracts entered into by Seller before the Petition Date.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article 2 and pursuant to Article 3, but, with respect to Article 2, only to the extent that an obligation:  (a) arises on or after the Closing; and (b) with respect to obligations arising under Transferred Contracts:  (i) does not arise from or relate to any breach by Seller of any provision of any of the Transferred Contracts; and (ii) does not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of any of the Transferred Contracts.

"**Bankruptcy Case(s)**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Procedures Order**" shall have the meaning set forth in the Recitals.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.2

"**Business**" means the production of visual effects, computer-generated animation, commercial advertising, cinematic game design and special venue and theme park films.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in Los Angeles, California are authorized or obligated by law or executive order to close.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), interests, damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Contracts**" mean all written or material oral purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases (for the premises located at [_____] at which the Business is operated, personal property or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any nature, including quotations and bids outstanding on the Closing Date, in each case that are used exclusively to support the Business or that relate exclusively to the Acquired Assets. The Contracts shall also include all contracts with customers for the locations identified in Schedule 1.1.1

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications for registration thereof; (v) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365 of the Bankruptcy Code or otherwise effectuate, pursuant

to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of the Assumed Contracts under the Sale Approval Order that are Transferred Contracts, which Cure Amounts shall be paid by the Purchaser.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**DIP Loan**" shall have the meaning set forth in the Recitals.

"**DIP Loan Agreement**" shall have the meaning set forth in the Recitals.

"**DIP Loan Documents**" shall have the meaning set forth in the DIP Loan Agreement.

"**DIP Loan Obligations**" shall mean all obligations owed by Seller to the Lenders pursuant to the DIP Loan Agreement and the DIP Loan Documents, in an amount not to exceed $17,086,000 plus up to $500,000 for the fees of the DIP Lenders, subject to the terms of the Sale Approval Order.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Final Order**" means an order or judgment:  (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Governmental Entity**" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Including**" means, whether or not initially capitalized, including without limitation.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Technical Documentation, Trade Secrets, Know-How and registered domain names and IP addresses in effect as of the date of this Agreement.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies, and other inventory, wherever located.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

A-3

"**Know-How**" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Licensed Intellectual Property**" means Seller's rights with respect to all Intellectual Property licensed or sublicensed to Seller from an affiliated or unaffiliated third party.

"**Lender(s)**" shall have the meaning set forth in the Recitals.

"**Lien**" means any lien, charge, encumbrance, Claim (as defined herein), pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the business, assets, properties, financial condition or results of operations of the Business taken as a whole, except any change or event resulting from, relating to or arising out of: (a) any act or omission of a Seller taken with the prior written consent of the Purchaser; (b) any action taken by a Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from the filing of the Bankruptcy Case or from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any of such countries; (h) acts of God; (i) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (j) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (k) changes in any Law; (l) any existing event, occurrence or circumstance listed in the Disclosure Schedule as of the date hereof (except to the extent excluded by the Agreement); (m) any adverse change in or effect on the Business that is entirely cured by Seller before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 9.1 or Section 9.2 hereof; or (n) the regulatory status of the Purchaser.

"**OFAC**" shall have the meaning set forth in Section 5.2.10.

"**Order**" means an order of the Bankruptcy Court which has not yet become a Final Order.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary course of business consistent with custom and practice of the Business from and after the Petition Date or to the extent consistent with orders issued in the Bankruptcy Case.

"**Outside Date**" shall have the meaning set forth in Section 9.1.1(C)

"**Owned Intellectual Property**" means all Intellectual Property in and to which Seller holds, or has a right to hold, in whole or in part, right, title and interest.

"**Party**" or "**Parties**" means Purchaser and/or Seller.

"**Patent Rights**" means:  (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents, and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property, including production machinery, equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks and other tangible personal property, whether located at the Premises, at the place of business of a vendor, or a customer or elsewhere.

"**Petition Date**" shall mean February 13, 2013.

"**Post-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Pre-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Premises**" means 2100 East Grand Avenue El Segundo, CA 90245.

"**Product**" shall mean all products manufactured, marketed or sold and all services sold by the Business.

"**Purchase Price**" means the payment referred to in Section 4.1.

"**Purchased Intellectual Property**" means all Owned Intellectual Property and Licensed Intellectual Property listed in Schedule 1.1.1.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Sale**" means the sale of the Acquired Assets in accordance with the Sale Approval Order.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, including provisions which:

(i)    approve and authorize this Agreement and the transactions contemplated in this Agreement and the Ancillary Agreements;

(ii)    include a specific finding that the Acquired Assets acquired by Purchaser were purchased in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that Purchaser is entitled to the protections of such section;

(iii)    provide that the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code and the assignment pursuant to Section 365 of the Bankruptcy Code of Seller's right, title and interest in and to the Assumed Contracts shall be free and clear of all Liens, Claims, interests and encumbrances pursuant to Section 363 of the Bankruptcy Code, it being expressly understood and agreed that the terms, conditions and restrictions of any licenses, permits, approvals or the like included in or applicable to the Acquired Assets shall not be deemed Liens;

(iv)    provide that except to the extent provided in this Agreement, Purchaser shall have no liability or responsibility for any Claim against Seller or any Affiliate of Seller;

(v)    provide that the sale of the Acquired Assets shall have been conducted pursuant to an auction and that adequate notice of the opportunity to bid was provided by Seller;

(vi)    provide that the price to be paid for the Acquired Assets represents the highest and best offer therefor; and

(vii)    provide that the Bankruptcy Court shall retain jurisdiction to enforce the terms and provisions of the Sale.

"**Sale Motion**" means the motion filed with the Bankruptcy Court on [_____] seeking entry of the Sale Approval Order.

"**SDN List**" shall have the meaning set forth in Section 5.2.10.

"**Seller's Knowledge**" or "Knowledge of Seller" means the actual knowledge of the following individuals: [_____].

"**Software**" means computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Straddle Period**" means any taxable period that begins on or prior to the Closing Date and ends after the Closing Date.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Technical Documentation**" means all documented technical information currently in the files of the Seller used exclusively to support the Business

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.D.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third Party Rights**" all rights claims or causes of action against any Person relating to the assets and properties of the Business, including (i) any rights, claims or causes of action against Purchaser or its Affiliates, other than any rights, claims or causes of action against Purchaser or its Affiliates arising pursuant to this Agreement, (ii) all third party warranties and guarantees with respect to any and all of the Acquired Assets, (iv) all related claims, credits, rights of recovery and setoff, and (v) all rights to insurance proceeds relating to the damage, destruction or impairment of any of the Acquired Assets, which damage, destruction or impairment occurred from the date of this Agreement through the Closing.

"**Trade Secrets**" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations (including but not limited to the data base of fingerprints and customer transaction information), specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii)

all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" means: (i) trademarks, trade names and service marks; (ii) the good will associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transferred Contracts**" means the Contracts of Seller to be assigned to Purchaser at Closing as described in Section 2.1.1.

"**Transferred Employees**" shall have the meaning set forth in Section 3.1.2.

"**United States**" means the 50 states and the District of Columbia of the United States of America.

"**USA PATRIOT Act**" shall have the meaning set forth in Section 5.2.10.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Law, and the rules and regulations thereunder.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# LIST OF SCHEDULES

| SCHEDULE DESIGNATION | SCHEDULE DESCRIPTION |
|---|---|
| A | Certain Defined Terms |
| 1.1.1 | Acquired Assets |
| 1.1.2.A | Bailed Assets |
| 1.1.2.E | Privileged Information and Materials |
| 1.1.2.H | Other Excluded Assets |
| 2.1.1 | Transferred Contracts |
| 3.1.1 | Business Employees |
| 4.2 | Allocation of Purchase Price |
| 7.2.1 | Assignment and Assumption Agreement |
| 7.2.2 | Bill of Sale |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1900 Avenue of the Stars, 21st Floor, Los Angeles, CA 90067-4590

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S MOTION FOR ORDERS: (1) APPROVING SALE OF DEBTOR'S ASSETS UNDER ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (2) APPROVING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS, (3) APPROVING CERTAIN BID AND AUCTION PROCEDURES, INCLUDING A BREAK-UP FEE, (4) SETTING DATE AND TIME FOR HEARING ON PROPOSED SALE, AND (5) APPROVING FORM AND NOTICE OF AUCTION AND SALE HEARING; DECLARATIONS OF JOHN PATRICK HUGHES AND PETER S. FISHMAN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 2, 2013, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) March 2, 2013 or as noted below, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

BY HAND (FOR DELIVERY ON 3/4/2013)
The Honorable Neil W. Bason
United States Bankruptcy Court
255 E. Temple Street, Suite 1552
Los Angeles, CA 90012

NORCO OVERNIGHT DELIVERY
Debtor
John Patrick Hughes, President CFO
2100 East Grand
El Segundo, CA 90245
☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 2, 2013  Sonia Gaeta | /s/Sonia Gaeta |
|---|---|
| *Date*            *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
74262-00017/1906426.7

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Russell Clementson  russell.clementson@usdoj.gov
for U.S. Trustee
Yolanda S Aguilar  wayne.smith@warnerbros.com
Courtesy NEF
Lorie A Ball  lball@peitzmanweg.com
Courtesy NEF
Gail L Chung  GL@outtengolden.com, JXH@outtengolden.com
Scott F Gautier  sgautier@peitzmanweg.com
Courtesy NEF
Ronald Clifford  rclifford@blakeleyllp.com, ecf@blakeleyllp.com;seb@blakeleyllp.com
for Anthony Barcelo
Brian L Davidoff  bdavidoff@greenbergglusker.com, jreinglass@greenbergglusker.com;
for Rhythm And Hues Inc  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;
  sgaeta@greenbergglusker.com
Jeffrey A Krieger  jkrieger@ggfirm.com, kwoodson@greenbergglusker.com;
for Rhythm And Hues Inc  calendar@greenbergglusker.com; pporooshani@greenbergglusker.com
Mary D Lane  mal@msk.com, mec@msk.com
Courtesy NEF
Katie Nownes  katie@omnimgt.com
Courtesy NEF
C John M Melissinos  jmelissinos@greenbergglusker.com, jreinglass@greenbergglusker.com;
for Rhythm And Hues Inc  kwoodson@greenbergglusker.com; calendar@greenbergglusker.com;
  sgaeta@greenbergglusker.com
Courtney E Pozmantier  cpozmantier@greenbergglusker.com, sgaeta@greenbergglusker.com
Claire E Shin  cshin@greenbergglusker.com, jreinglass@greenbergglusker.com;
for Rhythm And Hues Inc  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;
  sgaeta@greenbergglusker.com
David M Reeder  david@reederlaw.com, jessica@reederlaw.com
Thomas C. Capizzi
Hamid R Rafatjoo  hrafatjoo@venable.com, ataylor@venable.com; jnassiri@venable.com;
for Legendary Pictures, LLC  bclark@venable.com
Lori Sinanyan  lsinanyan@jonesday.com, lsinanyan@ecf.inforuptcy.com
for Twentieth Century Fox
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov
for U.S. Trustee
Howard J Weg  hweg@peitzmanweg.com
Courtesy NEF
Victor Sahn  vsahn@sulmeyerlaw.com,
Courtesy NEF  agonzalez@sulmeyerlaw.com,asokolowski@sulmeyerlaw.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**
74262-00017/1906426.7

**3.  SERVED BY EMAIL:**

| | |
|---|---|
| Anthony Barcelo, | anthonvbarcelo@mac.com |
| Committee member | |
| Gail C. Lin, Esq. | gl@outtengolden.com; |
| Jack Raisner, Esq. | jar@outtengolden.com; |
| Rene Roupinisn, Esq. | rsr@outtengolden.com |
| Counsel representing Anthony Barcelo | |
| Alexander Stevenson with Focal Point, LLC | astevenson@focalpointllc.com |
| Committee member | |
| Peter S. Kravitz, Esq. | PKravitz@SolutionTrust.com |
| Counsel representing Focal Point, LLC | |
| Wayne M. Smith with Warner Bros. | Wayne.smith@warnerbros.com |
| Committee member | |
| Scott F. Gautier | sgautier@peitzmanweg.com |
| Counsel representing Warner Bros. | |
| Lori Sinanyan | lsinanyan@JonesDay.com |
| Hamid Rafatjoo | HRRafatjoo@Venable.com |
| Russ Clementson | Russell.clementson@usdoj.gov |
| John Hedge | Jhedge@Scouler.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                     **F 9013-3.1.PROOF.SERVICE**
74262-00017/1906426.7